Vik Pawar, Esq.
**PAWAR LAW GROUP P.C.**
6 South Street, Suite 201
Morristown, New Jersey 07960
Telephone: (212) 571-0805
Facsimile: (212) 571-0938
Email: vikrantpawaresq@gmail.com

*Counsel for Plaintiff*

### UNITED STATES DISTRICT COURT
### DISTRICT OF NEW JERSEY

| | |
|---|---|
| REED JOHNSON, derivatively on behalf of SELLAS LIFE SCIENCES GROUP, INC. (f/k/a GALENA BIOPHARMA, INC.), | Case No.: |
| Plaintiff, | |
| vs. | **DEMAND FOR JURY TRIAL** |
| MARK W. SCHWARTZ, RYAN M. DUNLAP, CHRISTOPHER S. LENTO, REMY BERNARDA, WILLIAM L. ASHTON, RICHARD CHIN, IRVING M. EINHORN, STEPHEN GALLIKER, MARY ANN GRAY, SANFORD J. HILLSBERG, STEVEN A. KRIEGSMAN, and RUDOLPH NISI, | |
| Defendants, | |
| and | |
| SELLAS LIFE SCIENCES GROUP, INC. (f/k/a GALENA BIOPHARMA, INC.), | |
| Nominal Defendant. | |

### VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

### INTRODUCTION

Plaintiff Reed Johnson ("Plaintiff"), by his undersigned attorneys, derivatively and on

behalf of Nominal Defendant SELLAS Life Sciences Group, Inc. (f/k/a Galena Biopharma, Inc.)

("Galena" or the "Company"), files this Verified Shareholder Derivative Complaint against Individual Defendants Mark W. Schwartz, Ryan M. Dunlap, Christopher S. Lento, Remy Bernarda, William L. Ashton, Richard Chin, Irving M. Einhorn, Stephen Galliker, Mary Ann Gray, Sanford J. Hillsberg, Steven A. Kriegsman, and Rudolph Nisi (collectively, the "Individual Defendants" and together with Galena, the "Defendants") for breaches of their fiduciary duties as directors and/or officers of Galena, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of Section 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act").   As for his complaint against the Defendants, Plaintiff alleges the following based upon personal knowledge as to himself and his own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Galena, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet.   Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## **NATURE OF THE ACTION**

1.     This is a shareholder derivative action that seeks to remedy wrongdoing committed by Galena's directors and officers starting on August 11, 2014 and through the present (the "Relevant Period").

2.     Galena is a biopharmaceutical company that develops oncology and hematology therapeutics.

3.     The Company acquired its first commercial product, Abstral (fentanyl) Sublingual Tablets from Orexo AB on March 18, 2013, for distribution and sale in the U.S.

4.     Abstral is a powerful opioid narcotic that the U.S. Food and Drug Administration (the "FDA") approved as a sublingual, or under the tongue, tablet for the management of breakthrough pain in cancer patients who are at least 18 years old and are already receiving and are tolerant to opioid therapy for their persistent baseline pain.

5.     In May 2015, the Company's top two prescribers of Abstral were arrested for running a "pill mill" and their practices, which generated a significant portion of the Company's revenues, were closed.

6.     On August 6, 2015, the Company reported disappointing sales, operating loss, and full-year revenue figures.

7.     On this news, the price per share of Company stock fell $0.12, or 7.4%, from the previous day's closing price to close at $1.51 on August 7, 2015.

8.     On November 9, 2015, the Company then announced that it was going to divest its commercial business, which included the sale of Abstral, and that the Company anticipated exiting the commercial business by the close of the first quarter of 2016.   Moreover, the Company reported an impairment charge of $8.1 million to its commercial business net assets.

9.     On November 20, 2015, Galena announced its sale of Abstral, effective as of November 19, 2015, in a deal valued at up to $12 million, consisting of $8 million cash and up to $4 million in additional cash upon the achievement of specific sales milestones.   To this point, Abstral was the Company's only commercial product generating revenue.

10.     On December 11, 2015, Galena announced that Defendant Ryan Dunlap would be leaving the Company and his role as the Company's Chief Financial Officer, effective December 31, 2015.

11.     On December 22, 2015, Galena announced that the U.S. Attorney's Office for the District of New Jersey ("USAO – NJ") had issued the Company a subpoena requesting production of a broad range of documents pertaining to promotional and marketing practices related to Abstral.

12.     On March 10, 2016, the Company announced that it had received a trial subpoena in connection with a "federal investigation of two of the high-prescribing physicians for Abstral [that] has resulted in the criminal prosecution of the two physicians for alleged violations of the federal False Claims Act and other federal statutes," and that the Company had been in contact with the U.S. Attorney's Office for the Southern District of Alabama (the "USAO - S. Alabama"), which was handling the trial.   Moreover, Galena announced that "other governmental agencies may be investigating our Abstral promotion practices."

13.     On this news, the price per share of Company stock fell $0.03, or 3.3%, from the previous day's closing price to close at $0.86 on March 11, 2016.

14.     On May 10, 2016, the Company announced that a superseding indictment was filed in the criminal case prosecuted by the USAO - S. Alabama against the two high-prescribing physicians of Abstral, "which added additional information about the defendant physicians and provided information regarding the facts and circumstances involving a rebate agreement between the Company and the defendant physicians' pharmacy as well as their ownership of our stock," and that "we have learned that the FDA and other governmental agencies may be investigating our Abstral promotion practices."

15.     On July 14, 2016, the Company held its Annual Meeting of Stockholders (the "2016 Annual Meeting"), and improperly calculated shareholder votes on specific amendments (as discussed herein).

16.     On October 21, 2016, the Company held a Special Meeting of Stockholders (the "2016 Special Meeting"), and again improperly calculated shareholder votes.

17.     On January 9, 2017, the Company filed a current report on Form 8-K with the SEC, disclosing that the investigation into the Company by the DOJ and the USAO – NJ was a criminal investigation in addition to a civil investigation, and could involve Galena as well as one or more current and/or former employees of the Company.   Moreover, the Company announced that it was reimbursing any current and former employees' attorney's fees with respect to the investigation pursuant to its charter.

18.     On January 31, 2017, Galena announced that Defendant Mark W. Schwartz, its President, CEO and member of the Company's Board of Directors, was resigning and that Galena was "in the process of engaging an independent advisory firm to evaluate strategic alternatives for the company."   Multiple news outlets tied the federal investigation into the Company's marketing and promotional practices for Abstral to the resignation.

19.     On this news, the prices per share of Company stock fell $0.37 per share, or 22.4%, from the previous day's closing price to close at $1.28 on February 1, 2017.  By the close of market on February 2, 2017, the price per share of Company stock had declined a further $0.16, or 12.5%, to $1.12.[1]

20.     On September 8, 2017, the DOJ announced that it had reached an agreement with the Company to "resolve allegations that [the Company] paid kickbacks to doctors to induce

---

[1] On November 11, 2016, Galena executed a 1-for-20 reverse stock split.  All prices per share of Company stock after that date that are referenced in this Complaint reflect the post-split prices.

them to prescribe its fentanyl-based drug Abstral." The Company agreed to pay $7.55 million as part of the settlement. As noted by the DOJ, "'The conduct alleged by the government and resolved by today's settlement was egregious because it incentivized doctors to over-prescribe highly addictive opioids,' Acting U.S. Attorney Fitzpatrick said." Since "the matter remains under seal as to allegations against entities other than Galena," no other information regarding the investigation or lawsuits against the Company were disclosed.

21.     During the Relevant Period, the Individual Defendants caused the Company to engage in a scheme consisting of: (1) allowing, incentivizing, and encouraging the highest prescribers of Abstral to prescribe it illegally for unintended off-label purposes to non-cancer patients, artificially inflating Galena's revenues and net sales; (2) paying illegal kickbacks to those prescribers who wrote illegal Abstral prescriptions (upon which the Company's net sales and revenues were reliant); (3) allowing those prescribers to attempt to profit through the Company's overvalued stock, which involved, as the Individual Defendants were aware, a stock manipulation scheme by Galena's top two prescribers of Abstral to buttress the price of Company stock through outsized revenues generated by the illegal prescriptions for Abstral, followed by cashing in once the prices increased; and (4) using the outsized revenues created by this scheme to fund Galena's operations and the artificially inflated stock to obtain equity financing (collectively, the "Prescribing Scheme").

22.     Moreover, during the Relevant Period, the directors of Galena at the time of the 2016 Annual Meeting and the 2016 Special Meeting breached their fiduciary duties by: (1) intentionally making false statements in the respective proxy statements for the 2016 Annual Meeting and the 2016 Special Meeting; (2) improperly calculating votes at the 2016 Annual Meeting and the 2016 Special Meeting, allowing for the approval of certain amendments which

would not have been approved otherwise; (3) filing and/or causing to be filed invalid amendments with the Delaware Secretary of State; and (4) issuing invalid stock for which they lacked authorization per the Company's certificate of incorporation (collectively, the "Voting Misconduct").

23.    Also during the Relevant Period, the Individual Defendants personally made and/or caused the Company to make a series of materially false and/or misleading statements regarding the Company's business, operations, prospects and legal compliance.  Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and/or misleading statements and/or omissions of material fact that failed to disclose that: (1) Galena violated various federal statutes in relation to its sales of Abstral, including by engaging in the Prescribing Scheme; (2) Galena's sales figures for Abstral were drawn from unsustainable sales and marketing practices and thus not indicative of future performance; (3) as a result of the foregoing, the Company was exposed to both criminal and civil liability; (4) the Company engaged in the Voting Misconduct; and (5) the Company failed to maintain internal controls.

24.    As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.  The Individual Defendants failed to correct and/or caused the Company to fail to correct these false and/or misleading statements and/or omissions of material fact, rendering them personally liable to the Company for breaching their fiduciary duties.

25.    Moreover, in breach of their fiduciary duties the Individual Defendants failed to maintain internal controls.

26.    In light of the Individual Defendants' misconduct, which has subjected the Company, two of its former President, Chief Executive Officers ("CEOs"), its former Vice

President, Chief Financial Officer ("CFO"), its former Senior Vice Presdidnet of Oncology Commercial Operations, and its Senior Vice President of Investor Relations to being named as defendants in a consolidated federal securities fraud class action lawsuit pending in this Court (the "Securities Class Action"), a stockholder class action pending in the Court of Chancery of the State of Delaware (the "Delaware Action"), the need to undertake internal investigations, the need to implement adequate internal controls, the losses from the waste of corporate assets, the losses due to the unjust enrichment of the Individual Defendants who were improperly over-compensated by the Company and/or who benefitted from the wrongdoing alleged herein, the Company will have to expend many millions of dollars.

27.    In light of Galena's Board of Directors (the "Board") being beholden to each other, their longstanding business and personal relationships with each other, and their not being disinterested or independent directors, a majority of the Board cannot consider a demand to commence litigation against the Individual Defendants on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

28.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1) and Rule 14a-9 of the Exchange Act, 17 C.F.R. § 240.14a-9, and raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

29.    This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

30.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

31.     Venue is proper in this District because a substantial portion of the transactions and wrongs complained of herein occurred in this District, one or more of the Defendants either resides or maintains executive offices in this District, and the Defendants have received substantial compensation in this district by engaging in numerous activities that had an effect in this District.

**PARTIES**

**Plaintiff**

32.     Plaintiff is a current shareholder of Galena.   Plaintiff has continuously held Galena common stock since before the beginning of the Relevant Period.

**Nominal Defendant Galena**

33.     Galena is a Delaware corporation with its principal executive offices at 4640 SW Macadam Avenue, Suite 270, Portland, Oregon, 97239.  Galena's shares trade on the NASDAQ Capital Market ("NASDAQ") under the ticker symbol "GALE."

**Defendant Schwartz**

34.     Defendant Mark W. Schwartz ("Schwartz") served as the Company's President, CEO from August 21, 2014 to January 31, 2017, and as a Company director from September 16, 2014 to January 31, 2017.  According to the Company's Schedule 14A filed with the SEC on June 3, 2016 (the "2016 Proxy Statement), as of May 16, 2016, Defendant Schwartz beneficially owned 1,791,220 shares of the Company's common stock.  Given that the price per share of the Company's common stock at the close of trading on May 16, 2016 was $1.31, Schwartz owned over $2.3 million worth of Galena stock.

35.     For the fiscal year ended December 31, 2016, Defendant Schwartz received $571,812 in compensation from the Company.  This included $569,250 in salary and $2,562 in all other compensation.

36.     The Company's 2016 Proxy Statement stated the following about Defendant Schwartz:

> **MARK W. SCHWARTZ, PH.D.** [2] [60] was appointed as a director on September 16, 2014. Dr. Schwartz brings more than 30 years of experience in the biotechnology and life science industry and was appointed President and Chief Executive Officer in August 2014. Previously, he was Galena's Executive Vice President and Chief Operating Officer following Galena's 2011 acquisition of Apthera, Inc. where he served as the company's President and Chief Executive Officer since 2010. Dr. Schwartz also serves on the board of Targazyme, Inc., and on the faculty of the Masters of Biotechnology Program at San Jose State University. Prior to Apthera,Dr. Schwartz served for five years as President and Chief Executive Officer of Bayhill Therapeutics, a company developing an innovative DNA vaccine platform for the treatment of autoimmune diseases where he completed a successful partnership with Genentech for the development of the company's Type 1 diabetes vaccine. He had also served as President and Chief Executive Officer of Calyx Therapeutics, which expanded significantly, and completed key Phase 1 and Phase 2 international clinical trials of novel anti-inflammatory compounds during his tenure. Earlier in his career, Dr. Schwartz held a range of positions in research and development, business unit management, business development and executive management at Trega BioSciences, Incyte Genomics, Synteni, Tripos Inc., Applied Biosystems and DuPont Diagnostics.
>
> Our Board of Directors believes that Dr. Schwartz is highly qualified to serve as a member of the Board of Directors because of Dr. Schwartz's scientific background and education, his experience in research and development, business development and because of his leadership experience, including as Chief Executive Officer, in a number of development stage biotechnology companies.

37.     Defendant Schwartz and the Company entered into an employment agreement on September 16, 2014 for his position as President, CEO of the Company, effective August 21, 2014.  Schwartz's employment agreement provided, as to clawback and termination:

> 5.8     Clawback Provisions.   Notwithstanding any other provisions in this Agreement to the contrary, any discretionary or other incentive-based compensation paid to Employee pursuant to this Agreement or any other

---

[2] Emphasis in original throughout unless otherwise stated.

agreement or arrangement with the Company which is subject to recovery under any law, government regulation or stock exchange listing requirement will be subject to such deductions and clawback as may be required to be made pursuant to such law, government regulation or stock exchange listing requirement (or any policy adopted by the Company pursuant to any such law, government regulation or stock exchange listing requirement).

6.    Termination.   This Agreement and Employee's employment may be terminated as set forth in the Section 6.

6.1    Termination by Employer for Cause; Termination by Employee. Employer may terminate Employee's employment hereunder at any time for "Cause" upon notice to Employee, and Employee may terminate his employment hereunder voluntarily without "Good Reason" (as hereinafter defined) upon not less than ninety (90) day's prior notice to Employer (which termination may, in Employer's sole discretion, be made effective at any time prior to the expiration of such ninety (90) day notice period). "Cause" for the purpose of this Agreement shall mean any of the following:

(a)    Employee's breach of any material term of this Agreement, including its Exhibits; provided that the first occasion of any particular breach shall not constitute Cause unless Employee shall have previously received written notice from Employer stating the nature of such breach and affording Employee at least ten (10) days to correct such breach;

* * *

(c)    Employee's act of fraud or dishonesty injurious to Employer or its reputation;

(d)    Employee's continual failure or refusal to perform his material duties as required under this Agreement after written notice from Employer stating the nature of such failure or refusal and affording Employee at least ten (10) days to correct the same;

* * *

(g)    any violation by Employee of any of Employer's written policies, code of conduct or workplace rules in effect from time to time that is materially injurious to Employer;

Upon termination of Employee's employment by Employer for Cause or by Employee voluntarily without Good Reason, all compensation and benefits to Employee hereunder shall cease, except that Employee shall be entitled to payment, in accordance with applicable law and in any event not later than three days after

the date of termination, of (i) any accrued but unpaid salary and accrued and unused paid "time off," (ii) any unpaid bonus that shall have been previously awarded to Employee as provided in Section 5.2, and (iii) reimbursement of business expenses accrued but unpaid as of the date of termination. In addition, Employer's indemnification obligations shall remain in effect in accordance with the terms thereof.

6.2     Termination by Employer without Cause. Employer may also terminate Employee's employment without Cause upon notice to Employee. Upon any termination pursuant to this Section 6.2, Employee shall be entitled to payment of:

(a)     in accordance with applicable law and in any event not later than three days after the date of termination, any accrued and unused paid "time off" in accordance with applicable law) and reimbursement of business expenses accrued but unpaid as of the date of termination;

(b)     salary at the then-current Base Salary, and without taking into account any bonus payments made pursuant to Section 5.2, for the six (6) month period following the date of termination (the "Severance Period"), payable in accordance with Section 5.1; provided, however, that, in the event of Employer's termination of Employee's employment pursuant to this Section 6.2 at any time on or after the date six (6) months following the Effective Date, the Severance Period shall be the twelve (12) month period following the date of termination;

(c)     accelerated vesting as of the date of termination of unvested, vesting stock options held by Employee as of the date of termination that otherwise would have become vested had Employee remained in Employer's employ throughout the Severance Period;

(d)     an amount equal to the monthly premium Employee would be required to pay for continuation coverage pursuant to the Consolidated Omnibus Budget Reconciliation Act of 1985, as amended ("COBRA") . . . .

**Defendant Dunlap**

38.     Defendant Ryan M. Dunlap ("Dunlap") served as the Company's Vice President, CFO from February 2014 to December 2015.   According to the Company's 2016 Proxy Statement, as of May 16, 2016, Defendant Dunlap beneficially owned 229,952 shares of the Company's common stock.   Given that the price per share of the Company's common stock at the close of trading on May 16, 2016 was $1.31, Dunlap owned over $301,237 worth of Galena stock.

39.    For the fiscal year ended December 31, 2015, Defendant Dunlap received $609,028 in compensation from the Company.  This included $280,042 in salary, a $42,075 bonus, $145,338 in option awards, and $141,573 in all other compensation.

40.    The Company's 2016 Proxy Statement stated the following about Defendant Dunlap:

> **RYAN M. DUNLAP, CPA** was our Vice President and Chief Financial Officer from February 2014 to December 2015, and also served as our Corporate Secretary until this position was added in July 2014. In establishing Mr. Dunlap's base salary for 2015, the Compensation Committee took into account his finance and accounting background, level of experience, financial management of both our clinical and commercial departments, and overseeing of our legal situations. Mr. Dunlap's base salary for 2015 was $280,500. He resigned from the Company on December 31, 2015 due to his inability to relocate to our new corporate headquarters.

41.    During the period of time when the Company materially misstated information to keep the stock price inflated, and before the scheme was exposed, Defendant Dunlap made the following sale of Company stock (and made no purchases of Company stock).  On June 1, 2016, Defendant Dunlap sold 126,875 shares of Company stock for $2.18 per share, for which he received approximately $276,587.  His insider sale, made with knowledge of material non-public information before the material misstatements and omissions were exposed, demonstrates his motive in facilitating and participating in the fraud.

**Defendant Lento**

42.    Defendant Christopher S. Lento ("Lento") served as the Company's Senior Vice Presidentof Oncology Commercial Operations from about May 2013 to December 31, 2015.

**Defendant Bernarda**

43.    Defendant Remy Bernarda ("Bernarda") has served as the Company's Senior Vice President, Investor Relations & Corporate Communications since May 2013.

**Defendant Ashton**

44.     Defendant William L. Ashton ("Ashton") served as a Company director from April 2013 to December 2017.  He also serves as Chair of the Compensation Committee, and as a member of the Nominating and Governance Committee and the Ad Hoc Committee. According to the Company's 2016 Proxy Statement, as of May 16, 2016, Defendant Ashton beneficially owned 400,000 shares of the Company's common stock.  Given that the price per share of the Company's common stock at the close of trading on May 16, 2016 was $1.31, Ashton owned $524,000 worth of Galena stock.

45.     For the fiscal year ended December 31, 2016, Defendant Ashton received $132,970 in compensation from the Company.  This included $99,970 in fees earned or cash paid and $33,000 in option awards.

46.     The Company's 2016 Proxy Statement stated the following about Defendant Ashton:

> **WILLIAM L. ASHTON** [65] was appointed as a director on April 26, 2013. Mr. Ashton has been a principal at Harrison Consulting Group, Inc., a privately-held biopharmaceutical consulting firm, since 2013. Mr. Ashton was the founding Dean of the Mayes College of Healthcare Business and Policy from 2005 to 2008 and was the Senior Vice President of External Affairs and an Assistant Professor at University of the Sciences in Philadelphia, Pennsylvania until 2013. From 1989 to 2005, Mr. Ashton held a number of positions at Amgen Inc., a biotechnology company, including Vice President of U.S. Sales and Vice President of Commercial and Government Affairs. Mr. Ashton currently serves on the boards of Recro Pharma, Inc., a publicly-held global pharmaceutical company, the Academy of Notre Dame, and Loyola University. Previously, he served on the boards of Sucampo Pharmaceuticals, Inc., the National Osteoporosis Foundation, and the Friends of the National Library of Medicine at the National Institutes of Health. Mr. Ashton holds a B.S., Education, from the California University of Pennsylvania and an M.A., Education, from the University of Pittsburgh.

**Defendant Chin**

47.    Defendant Richard Chin ("Chin") served as a Company director from 2009 to December 2017.   He also serves as a member of the Compensation Committee and the Nominating and Governance Committee.   According to the Company's 2016 Proxy Statement, as of May 16, 2016, Defendant Chin beneficially owned 412,500 shares of the Company's common stock.   Given that the price per share of the Company's common stock at the close of trading on May 16, 2016 was $1.31, Chin owned $540,375 worth of Galena stock.

48.    For the fiscal year ended December 31, 2016, Defendant Chin received $104,279 in compensation from the Company.   This included $71,279 in fees earned or cash paid and $33,000 in option awards.

49.    The Company's 2016 Proxy Statement stated the following about Defendant Chin:

> **RICHARD CHIN, M.D.** [49] has served as a director since 2009. Dr. Chin is a physician with extensive expertise in drug and biologics development. He has overseen multiple investigational new drug applications and new drug applications/biologic license applications, and has authored several textbooks on clinical trial medicine. Since 2012, Dr. Chin has been the President and Chief Executive Officer and director of Kindred Biosciences, Inc., a public biopharmaceutical company. From October 2008 until December 2011, he was Chief Executive Officer of OneWorld Health, a Bill and Melinda Gates Foundation-funded nonprofit organization engaged in developing drugs for neglected diseases. From July 2006 until October 2008, Dr. Chin was President and Chief Executive Officer of Oxigene, Inc., a biotechnology company. From June 2004 to July 2006, he served at Elan Pharmaceuticals, initially as Senior Vice President of Medical Affairs, and then as Senior Vice President of Global Development. From March 1999 to June 2004, Dr. Chin served in various roles at Genentech, Inc., now a Division of Roche Group, culminating in his last position as the Head of Clinical Research for Biotherapeutics Unit, overseeing clinical development of all Genentech products except for oncology products. Dr. Chin currently serves as an adjunct professor at the University of California at San Francisco. Previously, he was a member of the board of directors for ImmunoCellular Therapeutics, Ltd. Dr. Chin received his M.D. from Harvard University and also holds a law degree from Oxford University, where he studied as a Rhodes Scholar.

Our Board of Directors believes that Dr. Chin is highly qualified to serve as a member of the Board of Directors because of Dr. Chin's expertise with drug development, his experience as both an executive and director of public drug development companies, and his scientific and academic qualifications.

**Defendant Einhorn**

50.     Defendant Irving M. Einhorn ("Einhorn") served as a Company director from 2009 to December 2017.   He also serves as a member of the Audit Committee and the Nominating and Governance Committee.  According to the Company's 2016 Proxy Statement, as of May 16, 2016, Defendant Einhorn beneficially owned 200,000 shares of the Company's common stock.  Given that the price per share of the Company's common stock at the close of trading on May 16, 2016 was $1.31, Einhorn owned $262,000 worth of Galena stock.

51.     For the fiscal year ended December 31, 2016, Defendant Einhorn received $111,000 in compensation from the Company.  This included $78,000 in fees earned or cash paid and $33,000 in option awards.

52.     The Company's 2016 Proxy Statement stated the following about Defendant Einhorn:

**IRVING M. EINHORN** [74] was appointed as a director on March 14, 2014. Mr. Einhorn started his career in 1972 as a SEC Staff attorney. He rose to increasingly more responsible positions culminating in his appointment as Regional Administrator of the Commission's Los Angeles Regional Office where he was responsible for overseeing in excess of 100 staff members whose function was to implement the SEC's regulatory and law enforcement mandates principally in the Western United States. Subsequent to leaving the SEC in 1989, Mr. Einhorn has engaged in the private practice of law focused exclusively on federal, state and self- regulatory organization securities enforcement and securities compliance matters.

Our Board of Directors believes that Mr. Einhorn is highly qualified to serve as a member of the Board of Directors because of Mr. Einhorn's unique experience in SEC enforcement, SEC regulation, SEC compliance, and SEC disclosure requirements based on 17 years of service as an SEC attorney and over 40 years of experience as an attorney whose practice has been devoted exclusively to securities related compliance and enforcement matters.

**Defendant Galliker**

53.     Defendant Stephen S. Galliker ("Galliker") served as a Company director from 2009 to December 2017.  He also serves as Chair of the Audit Committee and as a member of the Compensation Committee.  According to the Company's 2016 Proxy Statement, as of May 16, 2016, Defendant Galliker beneficially owned 510,000 shares of the Company's common stock.  Given that the price per share of the Company's common stock at the close of trading on May 16, 2016 was $1.31, Galliker owned $668,100 worth of Galena stock.

54.     For the fiscal year ended December 31, 2016, Defendant Galliker received $127,808 in compensation from the Company.  This included $94,808 in fees earned or cash paid and $33,000 in option awards.

55.     The Company's 2016 Proxy Statement stated the following about Defendant Galliker:

> **STEPHEN GALLIKER, CPA** [69] has served as a director since 2007. Mr. Galliker served as the Chief Financial Officer of Kindred Biosciences, Inc., a public biopharmaceutical company, from September 10, 2013 to August 2014, after which he retired. Mr. Galliker served as the Executive Vice President, Finance and Administration, and Chief Financial Officer of Dyax Corp., a biopharmaceutical company focused on advancing novel biotherapeutics for unmet medical needs, from 1999 until his retirement in July 2008. From 1996 to 1999, Mr. Galliker was the Chief Financial Officer of Excel Switching Corporation, a developer and manufacturer of open switching platforms for telecommunications networks, and was Excel's Vice President, Finance and Administration from 1997 to 1999. Mr. Galliker was also a director of Osteotech, Inc., a formerly public medical device company, until its merger into Medtronic, Inc. in November 2010. Mr. Galliker received a B.S. from Georgetown University and an M.B.A. from the University of Chicago, and is a member of the American Institute of Certified Public Accountants and the Massachusetts Society of Certified Public Accountants.
>
> Our Board of Directors believes that Mr. Galliker is highly qualified to serve as a member of the Board of Directors because of Mr. Galliker's extensive experience as the Chief Financial Officer of pharmaceutical companies and as a director of a medical device company as well as his expertise in auditing and financial and

other related matters pertaining to the operation of publicly traded pharmaceutical companies.

**Defendant Gray**

56.     Defendant Mary Ann Gray ("Gray") served as a Company director from April 2016 to December 2017.   She also serves as a member of the Audit Committee and the Nominating and Governance Committee.   According to the Company's 2016 Proxy Statement, as of May 16, 2016, Defendant Gray beneficially owned 39,938 shares of the Company's common stock.   Given that the price per share of the Company's common stock at the close of trading on May 16, 2016 was $1.31, Gray owned over $52,318 worth of Galena stock.

57.     For the fiscal year ended December 31, 2016, Defendant Gray received $247,740 in compensation from the Company.   This included $32,940 in fees earned or cash paid and $214,800 in option awards.

58.     The Company's 2016 Proxy Statement stated the following about Defendant Gray:

> **MARY ANN GRAY, PH.D.** [63] was announced as a new director on April 26, 2016 and is being nominated for election at the Annual Meeting. Dr. Gray is currently President of Gray Strategic Advisors, LLC, which she started in 2003 and which provides strategic advice to both public and private biotechnology companies. Previously, she spent three and a half years with the Federated Kaufmann Fund focusing on both public and private healthcare investments. Prior to joining the Kaufmann Fund, Dr. Gray was a sell-side biotechnology analyst for nine years with Kidder Peabody, Dillon Read and Raymond James. Dr. Gray currently serves on the public company boards of Acadia Pharmaceuticals, Inc., Senomyx Inc., TetraLogic and Juniper Pharmaceuticals, Inc. At Acadia she also serves as chairman of the audit committee and on the compensation committee. At Senomyx she is chair of the compensation committee. At TetraLogic and Juniper she is chair of each company's audit committee. Previously, Dr. Gray also served on the boards of Dyax Corp., GTC Biotherapeutics, Inc., Telik, and Apthera, Inc. (private). Dr. Gray has a Ph.D. in Pharmacology from the University of Vermont where she focused on novel chemotherapeutic agents for the treatment of cancer. She did postdoctoral work at Northwestern University Medical School and Yale University School of Medicine. Earlier in her career, Dr. Gray held scientific positions at Schering Plough and NeoRx, managed pre-

clinical toxicology studies for the National Cancer Institute through Battelle Memorial Institute, and worked in a hospital laboratory.

Our Board of Directors believes that Dr. Gray is highly qualified to serve as a member of the Board of Directors with her experience as a financial analyst and portfolio manager responsible for over $1 billion in healthcare investments in the biotechnology industry, as well as a background in scientific research. In addition, she has extensive prior and current service as a director for other development stage biotechnology companies and holds lead roles on the audit and compensation committees. Dr. Gray not only expands the Board of Directors' exposure to corporate and board governance practices at peer companies, but she is also the first female director nominee for Galena.

### Defendant Hillsberg

59.     Defendant Sanford J. Hillsberg ("Hillsberg") served as a Company director from 2007 to December 2017.  He also serves as Chairman of the Board and as Chair of the Ad Hoc Committee.  According to the Company's 2016 Proxy Statement, as of May 16, 2016, Defendant Hillsberg beneficially owned 653,421 shares of the Company's common stock.  Given that the price per share of the Company's common stock at the close of trading on May 16, 2016 was $1.31, Hillsberg owned over $855,981 worth of Galena stock.

60.     For the fiscal year ended December 31, 2016, Defendant Hillsberg received $132,280 in compensation from the Company.  This included $99,280 in fees earned or cash paid and $33,000 in option awards.

61.     The Company's 2016 Proxy Statement stated the following about Defendant Hillsberg:

**SANFORD J. HILLSBERG, J.D.** [67] has served as the Chairman of our Board of Directors since 2007. Mr. Hillsberg has been an attorney with TroyGould PC since 1976, is a member of the firm's Management Committee, and is currently a non-shareholder member of the firm. His practice has focused on the life sciences and technology industries, where he has represented many public and private companies in connection with their capital-raising, mergers and acquisitions, strategic alliances, licensing transactions, SEC reporting and corporate governance. Since 2013, Mr. Hillsberg has served as a director of Lion Biotechnologies, Inc., a cancer immunotherapy research and development

company. Mr. Hillsberg has previously held board of director positions at several publicly-held biopharmaceutical companies including ImmunoCellular Therapeutics, Ltd. where he was also a founder (2004-2007), Duska Therapeutics, Inc. (1999-2006), and Medco Research which was subsequently acquired by King Pharmaceuticals, Inc. Mr. Hillsberg is a member of the Board of Governors of Cedars-Sinai Medical Center and previously served as a Commissioner of the Quality and Productivity Commission of the City of Los Angeles. Mr. Hillsberg actively funds cutting-edge cancer research at institutions such as the National Foundation for Cancer Research, Massachusetts General Hospital, and the Mayo Clinic. Mr. Hillsberg holds a B.A. degree from the University of Pennsylvania and a J.D. degree from Harvard Law School.

Our Board of Directors believes that Mr. Hillsberg is highly qualified to serve as a member of the Board of Directors because of Mr. Hillsberg's extensive prior experience in founding and serving on the boards of a number of pharmaceutical and biotech companies, as well as his expertise in legal and other related matters pertaining to the operation of publicly traded pharmaceutical companies.

**Defendant Kriegsman**

62.     Defendant Steven A. Kriegsman ("Kriegsman") served as a Company director from 2006 to June 2016.  According to the Company's 2016 Proxy Statement, as of May 16, 2016, Defendant Kriegsman beneficially owned 605,000 shares of the Company's common stock.  Given that the price per share of the Company's common stock at the close of trading on May 16, 2016 was $1.31, Kriegsman owned $792,550 worth of Galena stock.

63.     For the fiscal year ended December 31, 2016, Defendant Kriegsman received $36,060 in compensation from the Company, all in the form of fees earned or cash paid.

64.     The Company's Schedule 14A filed with the SEC on April 30, 2015 (the "2015 Proxy Statement") stated the following about Defendant Kriegsman:

**STEVEN A. KRIEGSMAN** has served as a director since 2006. Mr. Kriegsman has been CytRx's Chairman, President and Chief Executive Officer since October 2014. Previously he served as President and Chief Executive Officer. Mr. Kriegsman also serves on the Board of Directors of Catasys, Inc. He previously served as Director and Chairman of Global Genomics from June 2000 until 2002. Mr. Kriegsman is an inactive Chairman and Founder of Kriegsman Capital Group LLC, a financial advisory firm specializing in the development of alternative sources of equity capital for emerging growth companies in the

healthcare industry. During his career, he has advised such companies as SuperGen Inc., Closure Medical Corporation, Novoste Corporation, Miravant Medical Technologies, and Maxim Pharmaceuticals. In the past five years, Mr. Kriegsman has also served on the Board of Directors of Bradley Pharmaceuticals, Inc. and Hythiam, Inc. Mr. Kriegsman has a B.S. degree with honors from New York University in Accounting and completed the Executive Program in Mergers and Acquisitions at New York University, The Management Institute. Mr. Kriegsman is a graduate of the Stanford Law School Directors' College. Mr. Kriegsman was formerly a Certified Public Accountant with KPMG in New York City.

Our Board of Directors believes that Mr. Kriegsman is highly qualified to serve as a member of the Board because of Mr. Kriegsman's experience as the Chief Executive Officer of a pharmaceutical company and as a director of a number of pharmaceutical companies, his experience as an investment banker for pharmaceutical and biotechnology companies, and his expertise in financial and other related matters pertaining to the operation of publicly traded pharmaceutical companies.

### Defendant Nisi

65.     Defendant Rudolph Nisi ("Nisi") served as a Company director from January 2009 to December 2017.  He is also Chair of the Nominating and Governance Committee, and a member of the Audit Committee, the Compensation Committee, and the Ad Hoc Committee. According to the Company's 2016 Proxy Statement, as of May 16, 2016, Defendant Nisi beneficially owned 423,500 shares of the Company's common stock.  Given that the price per share of the Company's common stock at the close of trading on May 16, 2016 was $1.31, Nisi owned $554,785 worth of Galena stock.

66.     For the fiscal year ended December 31, 2016, Defendant Nisi received $138,072 in compensation from the Company.  This included $105,072 in fees earned or cash paid and $33,000 in option awards.

67.     The Company's 2016 Proxy Statement stated the following about Defendant Nisi:

**RUDOLPH NISI, M.D.** [84] has served as a director since January 2009. Dr. Nisi has held various positions at New York Westchester Square Medical Center ("NYWSMC").  In addition to having been on the Active Staff in Internal

Medicine/Cardiology since 1963, Dr. Nisi was also Director of Medicine since 1975, Chief of Cardiology since 1975, Chairman of Medical Critical Care Unit since 1975, President of the Medical Board from 1977 to 1978, Chairman of the Board of Trustees since 1983 and from 1976 to 1978, Chairman of the ER Committee since 1984, and Vice-President of Medical Affairs since 1993. In 2011, Dr. Nisi retired as Chairman of the board of directors at NYWSMC and subsequently held the position of Vice Chairman. Dr. Nisi was the Chairman of the Board of Medco Research Inc. Dr. Nisi has also served as an Attending Physician at New York Hospital, a Clinical Assistant Professor of Medicine at Cornell University Medical College and an Assistant Dean at Weill Medical College of Cornell University. Dr. Nisi has also served as a director of Tempra Technology, Inc., a thermal research and development company, since 1997 and on the boards of Touchtone HMO and New York Presbyterian Hospital. Dr. Nisi holds a B.S. degree from Fordham University and a Doctor of Medicine degree from the University of Rome Medical School in Rome, Italy and is a fellow in the American College of Cardiology. Dr. Nisi is also a graduate of the Director's college at Stanford University.

Our Board of Directors believes that Dr. Nisi is highly qualified to serve as a member of the Board of Directors because of Dr. Nisi's prior experience as a practicing physician, his prior experience as a director of a number of pharmaceutical and biotechnology companies, and his medical and academic qualifications.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

68.     By reason of their positions as officers, directors, and/or fiduciaries of Galena and because of their ability to control the business and corporate affairs of Galena, the Individual Defendants owed Galena and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Galena in a fair, just, honest, and equitable manner.  The Individual Defendants were and are required to act in furtherance of the best interests of Galena and its shareholders so as to benefit all shareholders equally.

69.     Each director and officer of the Company owes to Galena and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

70.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of Galena, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

71.     To discharge their duties, the officers and directors of Galena were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

72.     Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.  The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Galena, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company.  The conduct of the Individual Defendants who were also officers and directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised Galena's Board at all relevant times.

73.     As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NASDAQ, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, including the

dissemination of false information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information.

74.     To discharge their duties, the officers and directors of Galena were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company.  By virtue of such duties, the officers and directors of Galena were required to, among other things:

(a)     ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware, New Jersey, and the United States, and pursuant to Galena's own Corporate Code of Ethics and Conduct;

(b)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     remain informed as to how Galena conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)     establish and maintain systematic and accurate records and reports of the business and internal affairs of Galena and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)     maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Galena's operations would comply with all applicable laws and Galena's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)     exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)     refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)     examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

75.     Each of the Individual Defendants further owed to Galena and the shareholders the duty of loyalty requiring that each favor Galena's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

76.     At all times relevant hereto, the Individual Defendants were the agents of each other and of Galena and were at all times acting within the course and scope of such agency.

77.     Because of their advisory, executive, managerial, and directorial positions with Galena, each of the Individual Defendants had access to adverse, non-public information about the Company.

78.     The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Galena.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

79.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing.  The Individual Defendants caused the Company to conceal the true facts as alleged herein.  The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

80.     The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, gross mismanagement, abuse of control, and violations of Section 14(a) of the Exchange Act; (ii) conceal adverse information concerning the Company's operations, financial condition, legal compliance, future business prospects and internal controls; (iii) engage in the Prescribing Scheme and the Voting Misconduct; and (iv) to artificially inflate the Company's stock price while one of the Individual Defendants engaged in insider sales.

81.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully or recklessly to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who is a director of Galena

was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

82.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein.  In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted in the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

83.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Galena, and was at all times acting within the course and scope of such agency.

## GALENA'S CODE OF ETHICS

84.     Pursuant to the Company's Corporate Code of Ethics and Conduct (the "Code of Ethics"), "Each . . . Company employee, officer and director, as well as agents and contractors working on behalf of the company, must work to comply with the policies set forth in [the Code of Ethics."

85.     The Code of Ethics provides, as to "General Policy," that:

It is the policy of Galena Biopharma, Inc. (the "Company") to conduct business in compliance with all applicable laws, rules and regulations. Further, it is our policy to conduct business with integrity. We make this commitment to our customers, to our partners, to our shareholders, to our community, to those government agencies that regulate the Company, and to ourselves.

86.     The Code of Ethics provides, as to "Compliance with the Law," that:

The Company seeks to comply with all applicable government laws, rules and regulations. We need the cooperation of all employees, officers and directors to do so and to bring lapses or violations to light. While some regulatory schemes may not carry criminal penalties, they control the licenses and certifications that

allow the Company to conduct its business. The Company's continued ability to operate depends upon your help for compliance.

Some of the regulatory programs, which employees may deal with in the course of their duties, include, but are not limited to, the following:

- o Labor laws.
- o Occupational Safety and Health regulation.
- o Building, safety, and fire codes.
- o Wage and Hour Laws.
- o Laws and regulations pertaining to the development, manufacture and sale of biopharmaceutical products, including, without limitation, the U. S. Food, Drug & Cosmetic Act and all applicable U.S. Food and Drug Administration regulations and guidance documents relating to the manufacture, promotion and sale of biopharmaceutical products.

87.     The Code of Ethics provides, as to "Special Ethical Obligations for Employees

with Public Reporting Responsibilities," that:

As a public company, we are also committed to carrying out all continuing disclosure obligations in a full, fair, accurate, timely and understandable manner.

Depending on their position with the Company, employees, officers or directors may be called upon to provide information to assure that the Company's public reports are complete, fair and understandable. The Company expects all of its personnel to take this responsibility very seriously and to provide prompt and accurate answers to inquiries related to the Company's public disclosure requirements.

Because of this special role, all employees, officers, and directors are bound by the following Code of Ethics, and by accepting this Code of Ethics, each agrees, as applicable, that he or she will:

- o Act with honesty and integrity, avoiding actual or apparent conflicts of interest in personal and professional relationships.
- o Provide information that is accurate, complete, objective, relevant, timely and understandable to ensure full, fair, accurate, timely, and understandable disclosure in reports and documents that [Company] files with, or submits to, government agencies and in other public communications.
- o Comply with rules and regulations of federal, state, provincial and local governments, and other appropriate private and public regulatory agencies.
- o Act in good faith, responsibly, with due care, competence and diligence, without misrepresenting material facts or allowing one's independent judgment to be subordinated.

- Respect the confidentiality of information acquired in the course of one's work except when authorized or otherwise legally obligated to disclose. Confidential information acquired in the course of one's work will not be used for personal advantage.
- Share knowledge and maintain skills important and relevant to shareholder's needs.
- Proactively promote and be an example of ethical behavior as a responsible partner among peers, in the work environment and the community.
- Achieve responsible use of and control over all assets and resources employed or entrusted.

The Accounting Department bears a special responsibility for promoting integrity throughout the organization, with responsibilities to shareholders both inside and outside of the Company. The Chief Executive Officer, the Chief Financial Officer and other Accounting Department personnel have a special role both to adhere to these principles themselves and also to ensure that a culture exists throughout the company as a whole that ensures the fair and timely reporting of the Company's financial results and condition.

88.      The Code of Ethics provides, as to "Media/Public Relations and Governmental Inquiries," that:

When the Company provides information to the news media, securities analysts and stockholders, it has an obligation to do so accurately and completely.

89.      In violation of the Code of Ethics, the Individual Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' schemes to engage in the Prescribing Scheme and the Voting Misconduct, and to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, gross mismanagement, abuse of control, waste of corporate assets, unjust enrichment, and violations of Section 14(a) of the Exchange Act. Moreover, in violation of the Code of Ethics, the Individual Defendants failed to comply with laws and regulations, maintain the accuracy of Company records and reports, and uphold the employee and director responsibilities related thereto.

## COMMITTEE CHARTERS

90.     The Company's Audit Committee Charter states, in relevant part:

1.      <u>Purpose</u>.  The purpose of the Audit Committee . . . shall be to . . . assist the Board's oversight of . . . the Company's accounting and reporting processes and compliance with legal and regulatory requirements . . . ."

\* \* \*

4.      <u>Responsibilities of the Committee</u>.

     a.      <u>General</u>.  The function of the Committee is oversight.

\* \* \*

     c.      <u>Oversight of the Audit Process and the Company's Legal Compliance</u>.

\* \* \*

        vii.     Review material pending legal proceedings involving the Company and other contingent liabilities.

        viii.    Receive from the Chief Executive Officer and Chief Financial Officer a report of all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting and any fraud that involves management or other employees who have a significant role in the Company's internal controls.

\* \* \*

        xiii.    Review the metrics used by management to provide insight into the Company's compliance and quality systems and organization; and

        xiv.     At least annually, review with the Chief Compliance Officer the status of the Company's compliance with its Code of Business Conduct and Ethics, internal Company policies, insider trading policy, and non-healthcare related laws and regulations, including the federal securities laws.

91.     The Company's Nominating and Corporate Governance Committee Charter states, in relevant part:

<u>Purpose of the Committee</u>

The primary purpose of the Committee is to (1) identify individuals qualified to become members of the Board, (2) recommend for the Board's selection the director nominees for each annual meeting of stockholders, (3) periodically review the Company's corporate governance principles and, if necessary or otherwise appropriate, recommend modifications to such principles for Board approval, and (4) oversee the periodic evaluation of the Board, its committees and the Company's Chairman of the Board and Chief Executive Officer.

92.     The Company's Compensation Committee Charter states, in relevant part:

**Duties and Responsibilities**

The responsibilities of the Committee include the following:

* * *

- Review objectives relevant to executive officer compensation, evaluate the performance of executive officers in light of those goals and objectives and determine the compensation of non-CEO executive officers based on this evaluation;

* * *

**Powers of the Compensation Committee**

In order to fulfill its role, the Committee shall have the following powers:

* * *

- Compensation of Chief Executive Officer. The Compensation Committee shall review, determine and recommend for approval by the Board the compensation and other terms of employment of the Company's Chief Executive Officer and shall evaluate the Chief Executive Officer's performance in light of relevant performance goals and objectives. In evaluating the long-term incentive component of the Chief Executive Officer's compensation, the Compensation Committee should seek to achieve an appropriate level of risk and reward, taking into consideration the Company's performance and relative stockholder return, the potential benefits and costs to the Company of the award, the value of similar incentive awards given to chief executive officers of comparable companies, the awards given to the Company's Chief Executive Officer in past years, other elements of the Chief Executive Officer's compensation including total compensation and such other criteria as the Compensation Committee deems advisable. The Company's Chief Executive Officer may not be present during the voting or deliberations regarding his or her compensation.

93.     The 2016 Proxy Statement states that the Company had a Strategy Committee, which upon information and belief was renamed the Ad Hoc Committee.   The 2016 Proxy Statement describes the Strategy Committee as follows:

> The Strategy Committee acts as the primary contact between management of our Company and our Board of Directors with respect to developing and implementing our Company's long-term strategic plans and, together with management of the Company, reviewing and making recommendations to the Board of Directors with respect to prioritizing and funding strategic programs, the material terms and provisions of prospective strategic transactions, including financing transactions. The Strategy Committee reviews potential transactions to determine if they fit with the Company's corporate goals and long-term strategy and assists management with determining what, if any, resources should be devoted to pursuing those opportunities. The Strategy Committee does not have a formal charter, holds one regularly scheduled meeting per year, and also meets at the request of the Company's management when the need arises. In addition to any formal meetings,
> management often seeks the advice of members of the Strategy Committee when conducting its initial evaluation of program prioritization and potential transactions.

## GALENA'S DISCLOSURE POLICY

94.     The Company's Disclosure Policy, adopted on July 14, 2016, states, in relevant part:

**Objective**

The objective of this Disclosure Policy is to prevent selective disclosure of material nonpublic information regarding Galena Biopharma, Inc. (the "Company") and to ensure that communications to the public by or on behalf of the Company are:

- Factual and accurate
- Disseminated on a timely basis and in a manner reasonably designed to provide broad, nonexclusionary distribution of information to the public
- Made in a manner that complies with Regulation FD and other applicable laws

Premature, selective or otherwise unauthorized disclosure of internal or non-public information relating to the Company could adversely affect the Company's ability to meet its disclosure obligations under the federal securities laws. In

addition, premature, selective or unauthorized disclosure could cause competitive harm to the Company and in some cases could result in liability for the Company. Further, all information, whether material or immaterial, provided to outsiders must be accurate and consistent with these responsibilities.

**Designation of Authorized Spokespersons**

All calls concerning Galena stock and the Company's performance are referred to authorized spokespersons who are knowledgeable of the company's financials and have strong working knowledge of disclosure rules.  Only the following persons (the "Authorized Spokespersons") are authorized to communicate (including responding to inquiries) on behalf of the Company with the media, market professionals (e.g., securities analysts, institutional investors, investment advisers, brokers and dealers) and security holders unless other Authorized Spokespersons are identified:

- Chief Executive Officer
- Chief Financial Officer
- Senior Vice President of Investor Relations and Corporate Communications
- General Counsel
- Controller or Principal Accounting Officer
- Chief Medical Officer – for disclosure of all clinical/regulatory items

The Company will maintain procedures designed to ensure that the Authorized Spokespersons are kept informed of material developments affecting the Company.

* * *

**Disclosure of Material Nonpublic Information**

<u>Definitions of "Material" and "Nonpublic"</u>

Information concerning the Company is considered material if there is a substantial likelihood that a reasonable shareholder would consider the information important in making a decision to buy or sell the Company's securities. Stated another way, there must be a substantial likelihood that a reasonable shareholder would view the information as having significantly altered the "total mix" of information available about the Company.

## <u>INDIVIDUAL DEFENDANTS' MISCONDUCT</u>

### <u>Background</u>

#### *Abstral (fentanyl)*

95.     Galena develops oncology and hematology therapeutics.   Its only revenue generating product during the Relevant Period prior to the divestiture of its commercial business was Abstral (fentanyl).

96.     On October 3, 2013, the Company announced the launch of its Abstral (fentanyl) sublingual tablets which sought to treat breakthrough cancer pain.  The Company's formulation of Abstral purportedly delivered micronized fentanyl in a sublingual tablet made to dissolve in seconds under the tongue of a user and provide them with relief within minutes from breakthrough cancer pain.

97.     Abstral is an opioid pain medication that is associated with high risks of dependence and addiction.  It is a transmucosal immediate release fentanyl ("TIRF") drug product with FDA designated product class oversight by the TIRF Risk Evaluation and Mitigation Strategy ("REMS") Access Program, which serves to mitigate the risk of misuse, addiction, abuse, overdose, and serious complications due to medication errors with the use of TIRF medicines.  Healthcare professionals who prescribe to pharmacies, outpatients, and distributors must be enrolled in the TIRF REMS Access Program in order to obtain, dispense, prescribe, or distribute TIRF drug products.

98.     Fentanyl is the most powerful and potentially lethal opioid pain medication available, reportedly up to 100 times stronger than morphine and 5 times stronger than heroin. Fentanyl and other opioids such as hydrocodone and oxycodone are highly addictive and are among the products at the center of a growing opioid epidemic in the U.S.

99.     On November 5, 2015, the U.S. Drug Enforcement Agency (the "DEA") announced that the leading cause of injury death in the U.S had become drug overdose deaths— more than deaths from firearms and motor vehicle accidents.

100.    The use of Fentanyl, specifically, is a major contributor to the high number of opioid overdose deaths in the nation.  It is no surprise then, that Abstral is specifically indicated by the FDA for only "the management of breakthrough pain in cancer patients 18 years of age and older who are already receiving and who are tolerant to around-the-clock opioid therapy for their underlying persistent cancer pain."  It is considered "off-label" when prescriptions are written to patients that do not fit this criteria.

101.    On March 3, 2014, the Company announced the launch of "Galena Patient Services (GPS)" to enhance patients' access to Abstral by "guid[ing] the benefits investigation and prior authorization process," help[ing] [to] manage the appeals and denial process," and locat[ing] the preferred pharmacy." As noted by former Galena CEO Mark J. Ahn ("Ahn"), "Galena Patient Services will offer support to these patients and their healthcare providers by managing the benefits approval process to make prescribing and receiving Abstral as simple as possible."

### Laws and Regulations Controlling Marketing and Sales of Abstral

102.    Per the Federal Food, Drug, and Cosmetic Act ("FDCA") and its implementing regulations 21 U.S.C. § 301, *et seq.*, Galena, as a drug manufacturer, is prohibited from distributing drugs in interstate commerce for any intended use that the FDA has not approved as safe and effective.  *See* 21 U.S.C. § 355(a), (b).

103.    A company must first submit a New Drug Application ("NDA") and receive FDA approval of it in order to obtain FDA authorization to sell a new drug product.  21 U.S.C. § 355. In such an NDA, the company seeking approval must describe all the intended uses proposed for the new drug's labeling.  Moreover, the company must prove that the new drug is effective and safe for such uses based upon data from the clinical trials of the drug. 21 U.S.C. § 355(b).

104.    The FDA makes a determination as to whether the proposed drug product is effective and safe for use under the conditions suggested, prescribed, or recommended in the proposed labeling submitted to the FDA along with the product's marketing application or submission.  In order to do so, the FDA evaluates whether the conditions of use in the proposed labeling are supported by the required types and levels of evidence of safety and effectiveness and whether such conditions of use outweigh the risks of the product.  Once the FDA approves the drug product, the FDA required labeling of the product sets forth the conditions of use by which the product has been shown to meet the relevant standard for marketing, providing information and directions for how to safely and effectively use the product under these conditions.

105.    FDA review and approval of an NDA for commercialization of a drug is only with respect to the intended use or uses proposed in the specific NDA and the drug's labeling.  Per 65 Fed. Reg. 14286-01, "[a] use that does not appear in the labeling is not approved as safe and effective by FDA and is known as an 'unapproved' or 'off-label' use."

106.    Thus, when an approved drug is promoted for an off-label use, the drug then becomes an unapproved "new drug" with respect to that off-label use.  *See* 21 U.S.C. § 355(b), (d), (j).  Moreover, the approved drug is then considered "misbranded" as the labeling of the drug would thus not include "adequate directions for use."  21 U.S.C. § 352(f).  Unapproved "new drugs" and "misbranded" drugs are both prohibited from distribution in interstate commerce.  *See* 21 U.S.C. § 331(a), (d), (k).  Therefore, off-label marketing of such drugs violates the FDCA.

107.    Abstral's FDA approved product label specifically notes that Abstral is "indicated for the management of breakthrough pain in cancer patients 18 years of age and older who are

already receiving and who are tolerant to around-the-clock opioid therapy for their underlying persistent cancer pain."

### Anti-Kickback Regulations

108.    Per federal anti-kickback laws, the Company is prohibited from, among other things, paying, offering, or soliciting remuneration to induce the ordering or purchasing, or arranging for the ordering or purchase of, any healthcare item reimbursable under any federally financed healthcare program.

109.    Per the Anti-Kickback Statute, it is illegal for an individual to willfully and knowingly offer or pay remuneration in cash or in kind to induce a physician to order a service or good that is reimbursed by a federal healthcare program.  *See* 42 U.S.C. § 1320a-7(b)(2).   A remuneration is defined broadly as anything of value offered or paid in return for ordering, purchasing, or recommending the order or purchase of any item reimbursable by a federal healthcare program.  *See* Department of Health and Human Services, Office of Inspector General Compliance Program Guidance for Pharmaceutical Manufacturers, 68 Fed. Reg. 23731, 23737 (May 5, 2003).

110.    The Anti-Kickback Statute prohibits remuneration in order to ensure proper referrals and medical treatment.   Moreover, it seeks to limit unnecessary goods, treatment, or services that are not based on the needs of the patient but are instead based on improper incentives given to others, which interferes with the patient's right to choose proper medical care and services.

### The Physician Payments Sunshine Act

111.    As noted in the Company's SEC filings during the Relevant Period, the Company

is subject to the Physician Payments Sunshine Act.  As disclosed by the Company in its Form

10-Q filed with the SEC on May 20, 2016:

> The federal Patient Protection and Affordable Care Act **includes provisions known as the Physician Payments Sunshine Act, which requires manufacturers of drugs, biologics, devices and medical supplies covered under Medicare and Medicaid to record any transfers of value to physicians and teaching hospitals and to report this data beginning in 2013 to the Centers for Medicare and Medicaid Services for subsequent public disclosures. Manufacturers must also disclose investment interests held by physicians and their family members.** Failure to submit the required information may result in civil monetary penalties of up to $1 million per year for knowing violations and may result in liability under other federal laws or regulations.

(Emphasis added.)

### The Prescribing Scheme

112.    Dr. Xiulu Ruan ("Ruan") and Dr. John Patrick Couch ("Couch") were responsible

for generating thirty percent of the Company's Abstral revenues, and were eventually convicted

of running a pill mill in Mobile Alabama.  During the Relevant Period, Drs. Ruan and Couch

were visited by Defendants Schwartz and Lento, among other Company representatives, who

encouraged the doctors to prescribe Abstral to non-cancer patients—an off-label use.

113.    Two pain management clinics under the name Physicians Pain Specialists of

Alabama ("PPSA") and C&R Pharmacy ("C&R") were jointly owned and operated by Drs. Ruan

and Couch.  On May 20, 2015, PPSA's clinics were raided and shut down by law enforcement

following a joint investigation by the DEA and the FBI.  As a result of the investigation, Drs.

Ruan and Couch were charged with several federal felony offenses arising from their operation

of PPSA and C&R, including conspiracy to violate the Controlled Substances Act, Racketeer

Influenced and Corrupt Organizations ("RICO") conspiracy, substantive drug distribution

offenses, conspiracies to commit wire fraud, healthcare fraud, and mail fraud, and to violate the Anti-Kickback Statute, in addition to money laundering.

114.    During the seven-week trial ending late February 2017, evidence was presented by the U.S. that Drs. Couch and Ruan utilized C&R and PPSA as a criminal enterprise to violate the Controlled Substances Act and to commit mail and wire fraud, in violation of the RICO Act. The government specifically presented evidence that the doctors knowingly and willfully prescribed fentanyl, among other Schedule II and III Controlled Substances, outside the usual course of professional practice and not for a legitimate medical purpose, but for their own personal financial interests.

115.    Evidence presented during the trial showed that Drs. Ruan and Couch almost exclusively prescribed Abstral and Subsys—another instant-release fentanyl drug indicated for breakthrough cancer pain in opioid-tolerant adult patients—for off-label back, neck, and joint pain.

116.    The evidence presented also showed that Drs. Couch and Ruan purchased over $1.6 million worth of Galena stock and sought to manipulate the Company's stock price by driving up sales of Abstral.  The doctors, from the third quarter of 2013 through at least the end of 2014, were the numbers one and two prescribers of Abstral in the entire U.S.  In fact, during this period, nearly one out of every three prescriptions for Abstral written in the U.S. were written by one of these two doctors.  The jury ultimately found that Drs. Ruan and Couch also received illegal kickbacks from the manufacturer of Subsys, Insys Therapeutics, in exchange for prescribing substantial amounts of Subsys.

117.    C&R was located within a PPSA clinic location, and C&R would only fill prescriptions written by PPSA doctors, with Drs. Ruan and Couch receiving 75% of the profits

that came in from prescription drug reimbursements.  Approximately 91% of the Abstral and Subsys prescriptions written by Drs. Couch and Ruan were filled at C&R, and cost patients' insurance anywhere from $1,000 to $24,000 per month.

118.    As a result of the seven-week trial, which included 81 witnesses, the jury convicted both Drs. Ruan and Couch of: (1) conspiracy to prescribe Schedule II and III Controlled Substances outside the usual course of professional practice; (2) RICO conspiracy; (3) conspiracy to prescribe more than 40 grams of fentanyl outside the usual course of professional practice; (4) conspiracy to commit mail and wire fraud; (5) conspiracy to commit healthcare fraud; (6) conspiracy to receive illegal kickbacks related to the workers compensation dispensary; and (7) conspiracy to receive illegal kickbacks from Insys Therapeutics in exchange for prescribing Subsys.  Dr. Ruan was moreover convicted of substantive money laundering counts, and both doctors were also convicted of substantive illegal drug distribution counts associated with prescriptions written to particular patients.

119.    After the trial against Drs. Ruan and Couch, the DOJ instituted its civil and criminal investigation into the Company for illegal kickbacks paid to doctors, including Drs. Ruan and Couch, in violations of the False Claims Act and the Anti-Kickback Statute.

120.    The DOJ announced on September 8, 2017 that the action was settled in exchange for the Company paying over $7.5 million to the government.  The press release issued by the DOJ on September 8, 2017 stated, in relevant part:

> Galena Biopharma Inc. (Galena) will pay more than $7.55 million to resolve allegations under the civil False Claims Act that it paid kickbacks to doctors to induce them to prescribe its fentanyl-based drug Abstral, the Department of Justice announced today.
>
> "Given the dangers associated with opioids such as Abstral, it is imperative that prescriptions be based on a patient's medical need rather than a doctor's financial interests," said Acting Assistant Attorney General Chad A. Readler of the Justice

Department's Civil Division. "The Department of Justice intends to vigorously pursue those who offer and receive illegal inducements that undermine the integrity of government health care programs."

"The conduct alleged by the government and resolved by today's settlement was egregious because it incentivized doctors to over-prescribe highly addictive opioids," said Acting U.S. Attorney William E. Fitzpatrick for the District of New Jersey. "This settlement constitutes another example of the Department of Justice's ongoing efforts to battle the opioid epidemic on every front."

The United States contends that Galena paid multiple types of kickbacks to induce doctors to prescribe Abstral, including providing more than 85 free meals to doctors and staff from a single, high-prescribing practice; paying doctors $5,000, and speakers $6,000, plus expenses, to attend an "advisory board" that was partly planned, and attended, by Galena sales team members and paying approximately $92,000 to a physician-owned pharmacy under a performance-based rebate agreement to induce the owners to prescribe Abstral. The United States also contends that Galena paid doctors to refer patients to the company's RELIEF patient registry study, which was nominally designed to collect data on patient experiences with Abstral, but acted as a means to induce the doctors to prescribe Abstral. Galena has not marketed any pharmaceutical drug since the end of 2015.

Two of the doctors who received remuneration from Galena were tried, convicted and later sentenced to prison in the U.S. District Court for the Southern District of Alabama following a jury trial of, among other counts, offenses relating to their prescriptions of Abstral. Galena cooperated in that prosecution.

\* \* \*

The settlement is the result of a coordinated effort by the Civil Division's Commercial Litigation Branch and the U.S. Attorney's Office for the District of New Jersey, with assistance from the Department of Health and Human Services Office of Counsel to the Inspector General, and the Food and Drug Administration Office of Criminal Investigations' Metro Washington Field Office.

121. During the Relevant Period, the Individual Defendants caused the Company to market Abstral for off-label purposes, and encouraged Drs. Couch and Ruan and other non-cancer pain management doctors to prescribe Abstral to non-cancer patients (*i.e.*, off-label purposes).

122.     According to CW1,[3] who served as a Territory Business Manager from August 2013 through December 2014 at Galena, during his or her entire tenure the Company pushed its salespeople to market Abstral to pain specialists.  Per CW1, "I was always pushed to see doctors who didn't see any cancer patients."   Moreover, because the Company "couldn't get enough revenue from on-label patients," the Company encouraged its sales force to market Abstral to pain management doctors who did not treat cancer patients, which amounted to off-label promoting.

123.     CW1 stated, "I felt very strongly about promoting on-label.   I was very uncomfortable with the fact that more and more business was being generated by pain specialists."  Galena's management stated, per CW1, "'Hey look – that's where you can get more business.'"  As indicated by CW1, the Company's sales force "didn't have the relationships" in the oncology field to sell to cancer doctors.  CW1 noted that the Company's sales records would show that "the top prescribers were pain specialists.  If you go in their offices you never see any cancer patients and I think that's horrible."  After CW1 told their manager that he or she was uncomfortable with Galena's focus on off-label marketing, he or she was let go in December 2014, according to CW1.

124.     CW2 also served as a Territory Business Manager at Galena and worked in Indiana, Kentucky, and Ohio, serving from April 2014 until April 2015, when CW2 was let go for failing to meet his or her sales quotas.  CW2 reported to Regional Manager Scott Makenzie, who reported to National Director of Sales David Corin ("Corin"), who reported to Defendant Lento.   Per CW2, the Company had issues selling Abstral to oncologists because they did not

---

[3] Anonymous witnesses are identified herein with the designation "CW1," "CW2," etc., and all such or otherwise references to anonymous witnesses or employees are drawn from the Consolidated Class Action Complaint for Violations of the Federal Securities Laws filed in the Securities Class Action on October 6, 2017, which is attached as Exhibit A hereto, and correspond to the same referenced witnesses as contained therein.

have many pain patients.   Moreover, CW2 noted that pain clinics did not have many cancer patients—the intended group for the drug.  Also, Abstral was not prescribed by hospices because it was too expensive.  CW2 stated that he or she could not meet the Company's monthly sales quota because there were "not many real patients" for Abstral, and "[i]f you're selling ethically you can't do it."

125.   CW3 served from August 2014 to August 2015 as a Territory Business Manager for the Company, and reported to Regional Sales Manager Michael Hemenway (followed by Danielle Goodin), who reported to Corin, who reported to Defendant Lento.  CW3 confirmed that the Company was pushing its salespeople to market Abstral to non-cancer prescribers, such as primary care doctors and pain clinics.  CW3 noted that he or she felt that the Company wanted its sales staff to "chase back pain prescriptions or amputee prescriptions," and noted that most of the Company's sales team had no oncology drug sales experience, instead having backgrounds in selling generic drugs or pain management rugs.

126.   In a February 5, 2015 email from Corin provided by CW3, copying Defendant Lento, Corin provided specific instructions to the Abstral sales team, stating, in relevant part:

> It's no mystery to anyone that January was significantly lighter than December. Now, armed with the data, my hope is that we get back in front of these customers and turn the momentum in your favor. Here's what's in the attached file:
>
> 1. Tab 1- An overall running monthly summary of every Abstral prescriber from Day l ... I'll call this the Galena Book of History to Date
>
> 2. Tab 2- Take a closer look at the last 4 months of Abstral sales, so basically, who
> has been keeping food on our table as of late ... I'll call this our WARM list and closest to Galena Friends and Family
>
> 3. Tab 3- I'm a pictures guy, and this speaks to our top 25 prescribers. This group owns the chunk of the GALE business. When they're trending down, we're down ... when they're up, we're up. This goes back to the theory that we need more prescribers as we can't put all of "our eggs" in this basket of 25 prescribers and

you can clearly see the impact they this group has had on us in January ... ! call this list, the CODE RED, and FIX IT NOW ... My bat phone is ready to assist with any of these customers and I am more then happy to get in front of them as time permits and have the direct conversation to support your needs. Make sure this group is retrained on GPS & our PAP program. I witnessed a practice this week, which is on this list, that needed help in these areas. We simply can't assume our folks know or remember, as think about it, they have to remember these for every drug they prescribe.

4. Tab 4-The TRUTH- list every prescriber's growth or decline from December or January. If you want to know why we're down, and who's down, here it is in LIGHTS. I am going to request that by next Wednesday, we have touched every customer on this list, and please report the individual findings to your RSD's. This is a great way to recapture what you rightfully have earned .... / call this list, the 100% to plan list, you get these folks turned around, and you'll be headed towards your quota.

127.    In the spreadsheet attached to the email, Dr. Ruan was indicated as the highest prescriber of Abstral in the U.S., with 1,184 prescriptions written from the fourth quarter of 2013 through the fourth quarter of 2014.[4]  Dr. Couch is listed as the second largest Abstral prescriber, with 591 Abstral prescriptions written from the fourth quarter of 2013 through the fourth quarter of 2014.

128.    CW3 noted that during his or her tenure, CW3 "knew I was being challenged to go off-label," and that during his or her tenure the Company knew that the Insys Therapeutics was openly buying pain doctors to sell, but the Company still wanted its sales team "to chase those prescriptions."  CW3 noted that he or she would receive emails whenever anyone in CW3's territory would prescribe Subsys—mainly primary care doctors, not oncologists—because the Company "wanted you to steal the prescriptions."  CW3 believed "there was something fishy" about the Company's marketing of Abstral, and to protect himself or herself, CW3 saved the email.

---

[4] The Company's fiscal year begins January 1 and ends December 31.

129.   CW3 also produced a David Corin email from July 20, 2015, that also copied Defendant Lento, wherein Corin addressed disappointing July sales numbers.   In the email, David Corin stated:

> I want to be here till the "lights turn off," but if we don't do our part and drive business, the "lights will turn off." We simply in many cases (not all), aren't holding up our end of the bargain. The goal is to be an ASSET to the organization, not a LIABILITY.

130.   Soon after this email, in August 2015, CW3 decided to leave the Company. Before doing so, however, CW3 took part in an exit interview with Human Resources, noting that during the interview CW3 told the Human Resources representative that CW3 was "encouraged to get prescriptions off-label" and to "chase prescriptions whether they were for cancer pain or not."   CW3 was asked if he or she would be willing to speak with Defendant Schwartz about the issues raised, to which CW3 replied in the affirmative.   Defendant Schwartz, however, per CW3, did not contact CW3 to discuss these issues.

131.   CW3 noted that the Company's territory business manager with the highest sales was located in Alabama, where Drs. Ruan and Couch operated pain clinics and illegally prescribed Abstral.

132.   During the criminal trial of Drs. Ruan and Couch, David Corin testified against them, stating to the jury that the Company kept "an internal document that [Galena] would send out on a quarterly basis with all of our prescribers in the country, how many prescriptions they had written each quarter."   Per this document, Drs. Ruan and Couch were the largest prescribers of Abstral from the third quarter of 2013 through the fourth quarter of 2014, with Drs. Ruan and Couch as the numbers one and two prescribers, respectively.   A "good friend" of Dr. Ruan, Dr. Rho, was the third highest Abstral prescriber and was also a shareholder of Galena, per an email sent to Defendant Bernarda by Dr. Ruan, which Defendant Lento was copied on.

133.     From the third quarter of 2013 through the fourth quarter of 2014, Dr. Ruan wrote 1,302 Abstral prescriptions, Dr. Couch wrote 649 Abstral prescriptions, and Dr. Rho wrote 611 prescriptions for Abstral.  During that period, the fourth highest prescriber of Abstral only wrote 153 prescriptions for Abstral.

134.     Defendants Schwartz and Lento, specifically, encouraged doctors to prescribe Abstral to predominantly non-cancer patients.  Emails from October 2013 between Defendant Lento and Dr. Ruan, and copying Defendant Schwartz, show Defendant Lento encouraging Dr. Ruan to enroll non-cancer patients in the Company's "RELIEF" program," the purpose of which was to monitor how patients taking Abstral were doing with it.  The RELIEF program paid doctors $500 for each patient they enrolled in the program.  Dr. Ruan noted that he could not participate in the program because his "practice does not have very many patients who qualify," but Defendant Lento nonetheless attempted to persuade Dr. Ruan to enroll his non-cancer patients in the program, stating:

> I was surprised to receive this note today via Neil. I had thought that you were very
> excited to participate in Galena's RELIEF Registry. I believe there might exist some confusion on patient eligibility. Would it be possible to discuss at your earliest
> convenience? I'm copying Mark Schwartz, the Galena COO, and Allan Valmonte,
> the director of clinical affairs, and Dave Rowan regional business director. Thanks
> for your consideration.

135.     David Corin confirmed that the reason stated for Dr. Ruan not participating in the program was that "he doesn't have many cancer pain patients."  Corin, however, explained that Dr. Ruan misunderstood the program's eligibility and that the Company's RELIEF program enrolled both "cancer and non-cancer patients."  The Company thus clearly paid doctors for prescribing Abstral even though the Company was aware that the patients receiving Abstral

prescriptions were not cancer patients.  As noted by the DOJ's press release concerning its settlement with the Company, the RELIEF program was "nominally designed to collect data on patient experiences with Abstral, but acted as a means to induce the doctors to prescribe Abstral."

136.    Accordingly, since at least October 2013, the Individual Defendants knew or should have known that PPSA did not have cancer patients and that Abstral was instead being prescribed for off-label purposes.  Additionally, the Individual Defendants knew or should have known that Drs. Ruan and Couch were not oncologists and that PPSA was not a cancer treatment facility.  In fact, a nurse practitioner named Justin Palmer ("Palmer") who worked at PPSA from July 2010 until PPSA was shut down in 2015, stated that the vast majority of PPSA's Abstral prescriptions were written to non-cancer patients and that "we didn't have many cancer patients." Moreover, for the period "from 2011 to 2015," he had only seen maybe "10 or 15 active cancer patients."  Palmer testified, "we didn't have that many cancer patients.  I mean, I used it, I prescribed it for migraines that, you know, weren't responsive to other things.  And if I could, I would give it to the patients for breakthrough pain . . . ."

137.    Another nurse practitioner named Bridgette Parker, who worked at PPSA from 2012 until it was shut down, testified that Drs. Couch and Ruan prescribed Abstral to non-cancer patients despite it not being what Abstral was indicated for.  Bridgette Parker stated, "[I]t was used off label a lot, you know, for anything we could use it on."  She also testified that she believed the off-label uses that Drs. Ruan and Couch prescribed Abstral for were inappropriate, and that "I felt that it was used often when it shouldn't be."  Parker also confirmed that she was "encouraged" to prescribe Abstral by both Drs. Ruan and Couch.

138.   The Individual Defendants actively encouraged and/or allowed Drs. Ruan and Couch to prescribe Abstral for off-label purposes, and PPSA was consistently prescribing Abstral for off-label purposes.  Per Justin Palmer, Galena representatives, including executives, would frequently visit PPSA to meet with Drs. Ruan and Couch.  As Palmer stated, "[T]hat was commonplace, somebody coming from, you know, Abstral or Galena" to meet with Drs. Ruan and Couch.  Palmer noted that he was aware that Galena executives or representatives were at PPSA because he saw them at the office and would occasionally meet them.  Defendants Schwartz and Lento, in addition to other Company representatives, often communicated with Drs. Ruan and Couch and traveled to Mobile, Alabama for promotional visits with Drs. Ruan and Couch.

139.   One such visit occurred on February 25, 2014, when Defendant Lento and David Corin arrived in Mobile to visit Drs. Ruan and Couch, who were upset with Galena because they owned large amounts of Galena stock and the Company's stock price had dropped after certain Company insiders made massive stock sales.  Corin knew that Drs. Ruan and Couch were upset about the insider sales because "[t]hey sent several emails to my boss, whose name was Chris Lento, and others in the organization.  And I was–I had been forwarded those messages."  Per Corin, Drs. Ruan and Couch demanded "that Galena fire the board of directors, fire the CEO, and a change in leadership," and that Drs. Ruan and Couch's demands were taken seriously by the Company "[b]ecause they were [Galena's] highest Abstral prescribers" and "important individuals for Galena."  Galena's CEO at the time, Ahn, eventually resigned effective August 20, 2014.

140.   Defendant Schwartz met with Drs. Ruan and Couch at least in November 2014 and February 2015 in Mobile, and, per Corin, Defendant Schwartz made these visits "[b]ecause

Dr. Ruan and Dr. Couch wanted to meet with him." In fact, per Corin, "[i]t was demanded by Dr. Ruan that he meet with him."

141. Corin also made several trips to Mobile to visit Drs. Ruan and Couch, because Schwartz "wanted us to be more consistent in how often we came" to visit them and that Schwartz "wanted us to have a more regular cadence in our visits" with them "[b]ecause other companies were visiting consistently and the higher-ups in those companies, as well – from CEOs to most C-level employees. It was important that we had a presence as well." In fact, according to Corin, Dr. Ruan "made clear that we weren't giving them the same attention that other customer – other companies were," and that Dr. Ruan "explained it very clearly that we weren't doing enough. As a business, we weren't listening to [Drs. Ruan and Couch] enough and we weren't going to be successful."

142. These frequent visits constituted illegal off-label promotion of Abstral. The Individual Defendants were aware that Drs. Ruan and Couch treated non-cancer patients almost exclusively, yet continued to promote Abstral to the doctors and even offered incentives to them to continue to prescribe Abstral for off-label purposes. The Individual Defendants even actively attempted to aid Drs. Ruan and Couch in obtaining prior authorizations for their Abstral prescriptions to non-cancer patients and sent Company representatives to visit with them regarding how to get insurance coverage for their off-label Abstral prescriptions.

143. In furtherance of the Prescribing Scheme, the Individual Defendants moreover caused and/or allowed the Company to violate the Anti-Kickback Statute by paying Abstral prescribers illegal kickbacks.

144. During a dinner meeting attended by Corin, Dr. Ruan and other Company representatives in Mobile, Dr. Ruan "talked about what a high prescriber he was of all the

products in the class and recommended that it would be good for Galena to have him as a speaker." After the meeting, Dr. Ruan "asked our sales representative if he could be–rather than paid a speaking fee, to be paid in [Galena] stock."

145.    In 2014, as testified by Corin, "the company and C&R Pharmacy partnered on a marketing services agreement," which was "also known as the rebate agreement," and entered into between C&R and the Company in October 2014.  According to Corin, Defendant Schwartz signed the rebate agreement with C&R, pursuant to which the Company would pay C&R a certain percentage for the prescriptions of Abstral sold by C&R.  Per the rebate agreement, the Company was to pay C&R a percentage ranging from 8.75% to 20%, depending on the prescription dollars sold by C&R in a given month.  Corin noted, "[t]he average prescription of [of Abstral] could be several thousand dollars.  For the higher doses, you can get into the $10,000 range," and that "when this agreement went into place, C&R Pharmacy would earn more money from filling Abstral prescriptions."  As noted herein, the DOJ alleged that this rebate agreement was an illegal kickback given in exchange for prescriptions written for Abstral.

146.    Justin Palmer provided further insight into the scheme, testifying that "C&R was part of PPSA, at least in my mind, and it was connected to the building," and that PPSA patients essentially always got their Abstral prescriptions filled at C&R.  Most pharmacies, according to Palmer, did not carry Abstral because it was so expensive.  Per Palmer, "It was such an expensive drug, that nobody else really carried it and we did."  Thus, the Company was paying Drs. Ruan and Couch for the prescriptions of Abstral that they wrote by providing percentage payments to C&R for the prescriptions of Abstral that were filled there.  As C&R was owned by Drs. Couch and Ruan, this amounted to a kickback.  Corin in fact stated that the rebate agreement was made "in order to add additional profit to C&R's prescrib[ing] or dispensing of

Abstral," and thus the rebate agreement was entered into to incentivize Drs. Ruan and Couch to write prescriptions for Abstral, including for patients that the Company knew to be non-cancer patients. The rebate agreement ultimately, as intended, drove up prescriptions of Abstral and Company revenues, with Corin admitting that the number of prescriptions for Abstral from Drs. Ruan and Couch increased after the rebate agreement was in effect.

147. The Company, according to the testimony of Corin, also had rebate agreements essentially the same as its agreement with C&R with several oncology dispensing clinics and with two pharmacies that were non-oncology dispensing clinics.

### *The Manipulation of Galena's Stock Price*

148. Evidence presented at the criminal trial of Drs. Ruan and Couch also revealed that Drs. Ruan and Couch were invited to attend the Company's Advisory Board Meetings, which Dr. Couch attending at least one for which he was paid $5,000, plus expenses, by the Company. Dr. Ruan decided not to attend due to potential concerns about his ability to freely trade his Galena stock.

149. Drs. Ruan and Couch began accumulating large quantities of Company stock in November 2013. Per evidence provided at their trial, Drs. Ruan and Couch spent over $1.6 million on Company shares in a just over a six month period.

150. The Individual Defendants were aware that Drs. Ruan, Couch, and Rho were trading in Company stock while they were concurrently the Company's largest three Abstral prescribers, accounting for approximately 30% of all Abstral sales. In fact, in a January 20, 2014 email sent by Dr. Ruan to Defendant Lento concerning Dr. Ruan's participation in an advisory board meeting, Dr. Ruan clearly expressed his ownership of Galena stock to Lento. Thus, since at least this date, Defendant Lento was aware that Dr. Ruan was a stockholder of the Company.

In a January 18, 2014 email from Dr. Ruan to Dr. Couch, Dr. Ruan stated that he "plan[ned] to sell [his stock] quick on the side."

151.    In a February 2, 2014 email from Dr. Ruan to Dr. Couch, Dr. Ruan discussed plans to manipulate Company stock and "play[ing] a big role" in propping up the stock price by overprescribing Abstral in a "dominant fashion."  The email stated, in relevant part:

> When I read about the history of Insys, considering their initial IPO on May 7, 2013
> at $8, and within 7 months, it hit $60, despite the Subpoena by inspector general, I believe Gale has much better chance of hitting much higher. So, I will hold mine for at least a year, giving it 3 quarters to grow. It certainly has a chance be close to Insys in term of market share.
>
> Also, considering I have lost millions on real estate, I could afford to lose all mine in this, but there is a good chance that it will bring the most. I like the chances. I will wait till I see at least 3 quarters. This is the product we can play a big role. I am sure we can with Zogenix, but not in this dominant fashion as many other providers can do the same, but with Abstral.
>
> So, I believe it is worth the risk!

152.    Dr. Ruan further noted in a February 17, 2014 email to a friend that he believed "there will be a major market share taking over, which may drive the stock up" and that his plan was to "hold[] them for 1.5 years, give Galena enough time to eat the market share from Insys, as I believe it will."

153.    Per the testimony of Palmer, who bought Company stock per the advice of Dr. Couch, PPSA prescribed more patients on Abstral after Drs. Ruan and Couch, and Palmer bought Company stock.  The following exchange was part of Palmer's testimony:

> Q: Did you have occasion, after you bought Galena stock, to discuss prescribing Abstral with Dr. Couch?
>
> A: We -- we did. We talked about -- I mean, patients that were, you know, candidates or suitable candidates for that drug.
>
> Q: Did you begin to put a number of individuals on Abstral, number of patients?

A: Yes, yes.

Q: Had you been encouraged to do that by anyone?

A: I don't know if l would say encouraged. But, you know, it was suggested to find
people that could benefit or - I guess so, I mean.

Q: What was the purpose of that, finding people to put on Abstral?

A: Well, I mean, we did have shares in the company. So –

Q: You and who?

A: Dr. Couch and, I guess Dr. Ruan. And it was -- you know, it would have been financially a good decision.

Q: For you?

A: For me.

Q: And for who else?

A: For Dr. Couch and Dr. Ruan.

Q: Did the Abstral prescriptions at PPSA go up during that time initially?

A: Yes.

Q: After you bought stock?

A: Yes.

154.    Palmer further stated that PPSA "started writing more Abstral" prescriptions after he and Drs. Ruan and Couch purchased Company stock and that the increase in prescriptions was not due to an increase in cancer patients.  Specifically, Palmer was asked, "Was there some outbreak of people coming to PPSA with cancer during this period of time that you're aware of?," to which Palmer responded, "No."

155.   On March 16, 2014, Dr. Ruan sent an email to Defendant Bernarda, which Defendant Lento was copied to, wherein he requested that he and Drs. Couch and Rho be given an opportunity to speak with the Board.  In the email, Dr. Ruan stated, in relevant part:

> Remy, hope you have had a good weekend! / have had quite a few conversations with a few physicians who have all invested in your company.
>
> Dr. James Rho, a good friend of mine, who is an interventional pain specialist in CA and also a strong believer in Abstral and an expert in TIRF, is interested in joining the conference on Thursday with you and your BOD. I believe he should be of no stranger to your Abstral sales team, even if you may not know him. As a matter of fact, he has shared with me many positive feedback from using Abstral since last Fall. Just like Dr. Couch and I, Dr. Rho also believes Galena's product and its pipeline, and therefore a share holder as well.
>
> I had lengthy discussion with Dr. Rho and Dr. Couch this weekend. We feel that if will be very beneficial if we could attend this conference together, have a honest discussion with the Board of Director(s) of Galena, to express our feeling, concerns, opinions/recommendations, as we are not only share holders, but also your clients, and customers to some extent. I hope that is OK with you and your Board of Director(s).
>
> Thank you very much for your kind help!

156.   Defendant Bernarda replied to Dr. Ruan's email by scheduling a call for Drs. Ruan, Couch, and Rho to speak with Defendant Ashton and herself.

157.   The Individual Defendants, despite being aware that the three highest prescribers of Abstral were trading Company stock, thus allowed these three doctors to exert even greater influence over Galena by facilitating a phone call in which they could voice their "feeling[s], concerns, opinion/recommendations" to a Board member and one of the Company's senior executives.  As noted in an email from Dr. Ruan to Dr. Rho, "[t]he purpose of this talk is to express our opinion to push them to replace their CEO" and "to give them the impression that if they do not do it, we will switch to other Cos and its products altogether (I will use [sic] express this in a indirect way, but enough for them to understand what we will do if they don't do it)"

because "as you know very well, they know who we are . . . ."  Dr. Ruan stated further in the email, "Since you, Dr. Couch, and I are all share holders of the [sic] and together we represent a very significant portion of their business, we have a better chance of making it if team up together to get this done."

158.    In an April 14, 2014 email from Dr. Ruan to Defendant Bernarda, which copied Defendant Lento, Dr. Ruan commented on an insider trading scandal facing the Company, stating "I agree with many of other share holders that the executive team and BOD need to be replaced ASAP . . . ."  The email stated, in relevant part:

> Hi, Remy, how are you!? It has been a while since we last communicated. I hope this email could you (assuming you have not left yet).
>
> I dont even know where to start! In my life, I have never seen something like this, when a truly healthy, promising Co (Galena), with unique pipeline and solid a FDA approved product, employees with good morale and working ethics, has been totally ruined, not by natural disaster, politicians, or competition, but by its own executive officers and its board of directors, because of their blatant, insatiable greed and selfishness! To them, everything can be sacrificed, as long as their pockets are filled up! They dont give a damn about other shareholders' interest, the market, the public trust, the reputation of the company, their employees, and their customers, and the patients! What bothers everyone is the fact that the supervising BOD and its executive officers created this mess in cahoots! I agree with many of other share holders that the executive team and BOD need to be replaced ASAP, as no one would like to see Galena end up filing bankruptcy!! No one will believe whatever your CEO or BOD say or do! Their presence with Galena will be enough to wipe out any confidence/trust/hope from the public which is what needed to save Galena! The only thing that may save the Co is the change in the executive team and its BOD!!! This needs to happen and nothing can replace it!!! No one can/will develop any trust in them!

159.    Corin testified that Drs. Ruan and Couch's demands were taken seriously by the Company "[b]ecause they were [Galena's] highest Abstral prescribers" and were "important individuals for Galena."

160.    The Individual Defendants, in allowing and also encouraging Drs. Ruan, Couch, and Rho to influence the Company while also failing to disclose their stock ownership pursuant

to the Sunshine Act, were complicit conspirators in the doctors' express attempts to manipulate the price of Galena's stock for their personal benefit.  In a January 2014 email from Dr. Ruan to Defendant Lento, Dr. Ruan even described his desire to be able "to trade the stocks [he] purchased" without "risk" or "restrictions."   Despite being aware of Drs. Ruan, Couch, and Rho's intentions to manipulate the price of Galena stock, the Individual Defendants continued to empower the doctors and make efforts to please them, including through the actions discussed herein.  Moreover, by failing to disclose these doctors' ownership of Company stock in violation of the Sunshine Act, the Individual Defendants aided and took part in the doctors' scheme to manipulate the price of Company stock by helping conceal the doctors' ownership.

161.    As such, the Individual Defendants were complicit in the doctors' stock manipulation scheme, that also ultimately benefited the Company, because the Individual Defendants used the outsized revenues generated from the inflated, off-label Abstral prescriptions to fund Galena's operations, and used the Company's stock that was artificially inflated to obtain equity financing.

162.    The Individual Defendants, as the facts presented herein show, were aware that the Company's Abstral sales were substantially driven through the promotion of Abstral for off-label purposes, effectively inflating artificially the sales of Abstral because such off-label prescriptions to non-cancer patients could not be sustained.

163.    By September 9, 2014, PPSA had been advised that Medicare was auditing TIRF prescriptions and that "[a]ll patients must meet the criteria of an active cancer pain diagnosis only" in order Medicare to cover the prescription.  As PPSA was regularly prescribing Abstral to patients without active caner pain diagnoses, Medicare's express refusal to cover Abstral for off-label purposes was especially problematic.

164.    As the illegal overprescribing and dispensing of Abstral came to an end, as Medicare's decision made all but more certain, an exchange during Corin's testimony during Drs. Ruan and Couch's criminal trial further showed the importance of the illegal scheme to the Company.  The exchange was as follows:

Q: Do you know what, if anything, occurred in late May o/2015 regarding Dr. Ruan and Dr. Couch?

A: Our understanding is that their practice was shut down.

Q: Following the shutdown of their practice, what happened to prescriptions for Abstral?

A: In regards to Dr. Ruan and Dr. Couch?

Q: In regard to overall number of prescriptions written for Abstral after Dr. Ruan and Dr. Couch's practice was shut down?

A: Our volume dropped.

Q: Did it drop by a little bit or did it drop significantly?

A: Significantly.

Q: What then happened to Galena's ability to promote Abstral?

A: We were limited because we couldn't make up that revenue. And eventually Galena was forced to sell the product in December of 2015.

* * *

Q: At what point did you leave Galena?

A: December 31st, 2015.

Q: Did you leave on your own or were you fired?

A: The commercial team was dissolved.

Q: Why was the commercial team dissolved?

A: There were no commercial products to sell.

Q: And is that after Abstral was sold off?

A: Abstral and Zuplenz, which was our other product.

165.     Thus, the Individual Defendants were, or should have been, aware that Drs. Ruan and Couch were prescribing inordinate amounts of Abstral for off-label purposes which could not be sustained and that the Company's Abstral sales in large part were derived from these illegal prescriptions.  The vast number of prescriptions being written by Drs. Ruan and Couch, as compared to all other doctors that prescribed Abstral, in totality with all the facts discussed herein, show that the Individual Defendants were or should have been aware of the Prescribing Scheme.

166.     On February 22, 2017, Drs. Couch and Ruan were both found guilty on virtually all counts for running a massive pill mill.  Upon information and belief, the following evidence was introduced and/or the following was established during the criminal trial for Drs. Ruan and Couch:

- Drs. Couch and Ruan together ran C&R Pharmacy, and nine out of 10 prescriptions filled at that pharmacy from April 2012 to May 2015 were for Abstral and Subsys, fentanyl-based pain medications.

- Drs. Couch and Ruan bought a significant amount of shares of Company stock.

- During the period Drs. Couch and Ruan were engaged in wrongdoing, the Company's share price ballooned from $7 per share to $60 per share.

- C&R Pharmacy set up a rebate program with the Company that Drs. Couch and Ruan allegedly profited from.

- Charts showing the total prescriptions for Abstral written in 2014:
  - Ruan: 1,302
  - Couch: 649
  - Roh: 611

- Dr. Couch prescribed 45,285 and Dr. Ruan prescribed 68,116 units of fentanyl during the time period of the indictment, making them the numbers one and two prescribers

of fentanyl in Alabama.  At other points relevant to the indictment, Drs. Couch and Ruan were the top prescribers of Abstral and Subsys in the entire U.S.

- The USAO stated that Drs. Coach and Ruan were "very important" to Galena and Insys, claiming that top executives from both the companies had traveled from Oregon and Arizona, respectively, to meet with them in Alabama.

- An email chain where a pharmaceutical company executive assured Dr. Ruan that Abstral was not directly implicated in a case in Michigan, but was merely one of a class of drugs that a doctor was accused of dispensing improperly.

167.    On May 26, 2017, Dr. Couch was sentenced to 240 months and Dr. Ruan was sentenced to 252 months in federal prison.

**The Voting Misconduct**

168.    At the time of the 2016 Annual Meeting and the 2016 Special Meeting, Galena's Board consisted of Defendants Ashton, Chin, Einhorn, Galliker, Gray, Hillsberg, Nisi, and Schwartz (collectively, the "Meeting Directors").

***The 2016 Annual Meeting***

169.    On June 3, 2016, the Company filed the 2016 Proxy Statement and issued it to Galena's stockholders for the 2016 Annual Meeting, with the record date for the meeting set at May 16, 2016.   On that date, the Company had 181,837,117 shares of common stock outstanding and entitled to vote.   The Company's certificate of incorporation purportedly authorized the Company to issue 275,000,000 shares.

170.    Among the proposals to be voted on at the 2016 Annual Meeting, and which was recommended by the Meeting Directors, was the approval of an amendment to the Company's certificate of incorporation to increase the authorized number of shares of common stock from 275 million to 350 million (the "Increased Share Amendment").

171.    The 2016 Proxy Statement noted that approximately 34 million of the 275 million authorized shares remained available for issuance after accounting for shares reserved for future

issuances upon the exercise of outstanding warrants and outstanding or currently authorized stock options.

172.    The 2016 Proxy Statement moreover noted that the Meeting Directors believed that the Increased Share Amendment was necessary because it, among other things, would give them financing and capital raising flexibility.   Additionally, as a reason for increasing the authorized shares, the Meeting Directors noted "attracting and retaining employees by the issuance of additional securities."   In fact, the Meeting Directors specifically sought approval to increase the equity they could issue to the Company's employees, directors, advisors, and consultants from approximately 9.7 million to 26.5 million shares.

173.    The 2016 Proxy Statement specifically stated, "The affirmative vote of the holders of a majority of the shares of common stock issued and outstanding and entitled to vote at the Annual Meeting is required to approve the [Increased Share Amendment]."

174.    Moreover, the 2016 Proxy Statement addressed the counting of "broker non-votes," defined as "[s]hares held in 'street name' by brokers, banks or other nominees who indicate on their proxy cards that they do not have discretionary authority to vote such shares as to a particular matter," stating in relevant part:

> Shares held in "street name" by brokers, banks or other nominees who indicate on their proxy cards that they do not have discretionary authority to vote such shares as to a particular matter, which we refer to as "broker non-votes," will be counted for the purpose of determining whether a quorum exists but will not have any effect upon the outcome of voting with respect to matters voted on at the Annual Meeting except for "Proposal Two: Approval of Amendment to Amended and Restated Certificate of Incorporation to Increase Our Authorized Common Stock," where they will have the same effect as an "Against" vote. Brokers holding shares for clients who have not given specific voting instructions are permitted to vote in their discretion only with respect to "Proposal Five: Ratification of Selection of Independent Registered Public Accounting Firm."

175.    The 2016 Proxy Statement stated that if a Company stockholder holding in street name did not provided instructions to their broker as to how to vote the shares, then those shares could not be voted at the 2016 Annual Meeting.  Specifically, the 2016 Proxy Statement stated, "If the shares you own are held in 'street name,' the broker, bank or other nominee, as the record holder of your shares, is required to vote your shares in accordance with your instructions. In order to vote your shares held in 'street name,' you will need to follow the directions that your broker, bank or other nominee provides to you."  Accordingly, a reasonable stockholder who held in street name that did not instruct the record holder of their shares to vote to approve the Increased Share Amendment would understand that giving no instruction "will have the same effect as an 'Against' vote."

176.    On July 8, 2016, the Company announced that it entered into a Securities Purchase Agreement (the "SPA") to sell 28 million shares of common stock and issue warrants to purchase 14 million shares of common stock at $0.65 per share to a group of investors.  Per the announcement, the Company would buy back the options for $3.5 million if the Increased Share Amendment was not approved since the Company did not have enough authorized shares outstanding to issue the 14 million shares covered by the warrant.  The 2016 Proxy Statement was not amended to provide information on the SPA.

177.    On July 12, 2016, the Company announced that it agreed "to issue 5 parties in a settlement a total of 3,125,000 shares of the Company's common stock," related to the resolution of a prior class action against the Company.

178.    On July 14, 2016, the Company held the 2016 Annual Meeting.

179.    On July 18, 2016, the Company announced an amendment to the SPA, allowing the unrestricted ability to sell or issue stock in any transaction, including a November 18, 2014

agreement with Lincoln Park Capital, LLC (the "LPC Agreement").  Per the LPC Agreement, over a 36-month term and subject to certain conditions, the Company had the right to direct Lincoln Park Capital, LLC to purchase up to 400,000 shares of stock per business day as often as every other business day—not to exceed $2 million in total purchase proceeds per day—up to an aggregate purchase amount of $50 million.  The Company, as of July 13, 2016, had sold approximately $8 million in stock to Lincoln Park Capital, LLC pursuant to the LPC Agreement.

180.    The Company also announced the purported voting results for the 2016 Annual Meeting, noting with regard to the Increased Share Amendment: 91,183,457 votes for; 35,010,427 votes "against," and 2,291,122 votes abstaining.  The results noted no broker non-votes for the Increased Share Amendment.  Thus, the 91,183,457 votes "for" exceeded by a very small margin the 90,918,559 votes required to pass under the "majority of the 181,837,117 shares outstanding and entitled to vote" standard.

181.    With regard to the 2016 Proxy Statement proposals regarding the 2016 Incentive Plan and the Non-binding Vote on Executive Compensation, the Company announced 88,491,701 purported broker non-votes for each.  The Meeting Directors asserted that brokers lacked discretionary authority to vote on the proposals regarding Director Election, the Increased Share Amendment, and the 2016 Incentive Plan without specific instructions from the beneficial owner of the stock on how to vote.  Thus, the purported voting results announced by the Company for the 2016 Incentive Plan (and as later revealed the Increased Share Amendment) improperly counted broker non-votes despite that they were required to have been counted as votes "against" the proposal.  Or, alternatively, the 2016 Proxy Statement's disclosures were false and brokers chose to uniformly disregard the disclosures by improperly exercising discretionary authority to vote those shares.

182.   The Meeting Directors and the Company stated to plaintiff in the Delaware Action that the disclosure in the 2016 Proxy Statement regarding broker non-votes was false, and thus they did not improperly count broker non-votes as votes "for" the Increased Share Amendment.  The Meeting Directors and the Company asserted that brokers had discretionary authority to vote on the proposal and exercised it and thus included such votes as votes "for" in determining approval of the Increased Share Amendment, regardless of the fact that the 2016 Proxy Statement repeatedly and clearly expressed that the brokers lacked such authority.

183.   Nonetheless, a reasonable stockholder, believing that providing no voting instructions to their broker would have the same effect as providing instructions to vote "against" due to the statements made in the 2016 Proxy Statement, may have chosen simply not to provide voting instructions if they opposed the Increased Share Amendment.  Thus, the false disclosures by the Company could have had a material outcome on the voting result, as the Increased Share Amendment was purportedly approved by just 264,898 shares.

184.   The Meeting Directors were aware or should have been aware that their disclosures about broker non-votes were false before the 2016 Annual Meeting took place and that brokers were purportedly exercising discretionary authority in voting on the Increased Share Amendment, especially since they were provided with preliminary voting results before the meeting.  The Meeting Directors nonetheless willfully and/or recklessly failed to correct the false disclosures in the 2016 Proxy Statement because they believed that brokers would vote or would be more likely to vote in favor of the Increased Share Amendment.  The Meeting Directors moreover knew or should have known that the false disclosures may have caused stockholders opposing the Increased Share Amendment and holding in street name to provide no instruction to

their brokers and that the Increased Share Amendment was likely to be approved by a slim margin.

185.    The Meeting Directors chose not to postpone the Annual Meeting to make corrective disclosures or to challenge the broker votes for the Increased Share Amendment that the 2016 Proxy Statement clearly stated could not be voted "for" the Increased Share Amendment without instruction by the beneficial owner of the shares, because the Meeting Directors got the outcome they wanted—approval of the Increased Share Amendment.

186.    The Increased Share Amendment was not signed until September 14, 2016 and was not filed with the Delaware Secretary of State until October 17, 2016, despite the voting result being announced on July 18, 2016.

### The 2016 Special Meeting

187.    On September 21, 2016, the Meeting Directors and the Company sent a definitive proxy statement to Company shareholders for the 2016 Special Meeting (the "Special Meeting Proxy Statement") to vote on, amongst other things, an amendment to the Company's Amended and Restated Certificate of Incorporation.  The record date for the 2016 Special Meeting was set as September 9, 2016, and as of that date there were 214,481,939 shares of Galena common stock issued and outstanding, according to the Company.

188.    The Special Meeting Proxy Statement stated that the 2016 Special Meeting was being held for the following purposes:

> • Proposal No. 1 — To approve an amendment to the Company's Amended and Restated Certificate of Incorporation (as amended from time to time, the "Charter"), to effect a reverse stock split of the Company's common stock, at a ratio of not less than 1 for 2 and not greater than 1 for 20, with the exact ratio and effective time of the reverse stock split to be determined by the Board of Directors and publicly announced in a press release [(the "Stock Split Amendment")]. This proposal must be approved by a majority of the outstanding shares of our common stock. As a result,

abstentions and broker non-votes will have the same effect as a vote against such proposal.

- Proposal No. 2 — To authorize the issuance of shares of the Company's common stock issuable upon the redemption, conversion or other satisfaction of the Company's obligations under its Amended and Restated 9% Original Issue Discount Senior Secured Debenture due November 10, 2018 in the principal amount of $25,530,000, without the need for any limitation or cap on issuances as required by and in accordance with NASDAQ Marketplace Rule 5635(d). This proposal must be approved by a majority of the votes properly cast on the matter affirmatively or negatively. As a result, abstentions and broker non-votes will be entirely excluded from the vote and will have no effect on its outcome.

- Proposal No. 3 — To authorize adjournment of the Special Meeting, if necessary or appropriate to solicit additional proxies if there are insufficient votes at the Special Meeting in favor of the Reverse Stock Split (the "Adjournment Proposal"). This proposal must be approved by a majority of the votes properly cast on the matter affirmatively or negatively. As a result, abstentions and broker non-votes will be entirely excluded from the vote and will have no effect on its outcome.

- To conduct any other business properly brought before the Special Meeting.

189.   The Meeting Directors recommended to the Company's shareholders that each vote in favor of the three proposals.  The Stock Split Amendment would reduce the number of shares the Company had outstanding, but would not lower the amount of shares the Company was authorized to issue.  As a result, the Stock Split Amendment would still allow the Meeting Directors and the Company to issue hundreds of millions of additional shares.

190.   In the Special Meeting Proxy Statement, the Meeting Directors caused the Company to repeat what they themselves contend was a false statement that they knowingly repeated at the 2016 Annual Meeting and meetings going back as early as 2011, with regard to the counting of broker non-votes.  The Special Meeting Proxy Statement stated, in relevant part:

The approval of the Reverse Stock Split requires the affirmative vote of the majority of all outstanding shares. A representative of our Company will serve as the inspector of elections at the Special Meeting. The approval of the issuance of

common stock for the redemption and/or conversion of the debenture and warrants as described in Proposal No. 2 requires the affirmative vote of the majority of shares present in person or represented by proxy and voting on such matters at the Special Meeting.

Shares that abstain from voting as to a particular matter will be counted for the purpose of determining whether a quorum exists. However, with respect to Proposal No. 1 – Approval of Amendment to Amended and Restated Certificate of Incorporation to Effect a Reverse Stock Split, an abstention will have the same effect as an "Against" vote. Shares held in "street name" by brokers, banks or other nominees who indicate on their proxy cards that they do not have discretionary authority to vote such shares as to a particular matter, which we refer to as "broker non-votes," will be counted for the purpose of determining whether a quorum exists but will not have any effect upon the outcome of voting with respect to matters voted on at the Special Meeting except for Proposal No. 1 – Approval of Amendment to Amended and Restated Certificate of Incorporation to Effect a Reverse Stock Split where they will have the same effect as an "Against" vote. Brokers holding shares for clients who have not given specific voting instructions are permitted to vote in their discretion only with respect to Proposal No.2 – Authorize Issuance of Common Stock for Conversion of Debenture and Proposal No.3 – Approval of Adjournment of the Special Meeting.

191.    The Meeting Directors admission that the statement regarding the discretionary authority given to brokers was false strongly implies that the Meeting Directors were again attempting to improve their chances of gaining approval for another certificate amendment, as they had done in the 2016 Annual Meeting.  The Meeting Directors were aware that the Increased Share Amendment barely passed even with the false statement being made, and thus the Meeting Directors, fearing that a corrective disclosure would worsen the likelihood of approval, intentionally and in bad faith made the false statement in the Special Meeting Proxy Statement to increase the chances of approval of the Stock Split Amendment.

192.    Since the Company would not have the authorized shares required to effectuate Proposal 2 which provided for the conversion of debt into equity unless the stock held by all Company shareholders was reverse split up to 20-1, the Special Meeting Proxy Statement noted that the Stock Split Amendment was necessary for the implementation of Proposal 2.

193.    The Special Meeting Proxy Statement also made additional contradictory and false statements, including on page 3 when stating, "Brokers holding shares for clients who have not given specific voting instructions are permitted to vote in their discretion only with respect to Proposal No.2 – Authorize Issuance of Common Stock for Conversion of Debenture and Proposal No.3 – Approval of Adjournment of the Special Meeting." This contradicted a statement made on page 23 which stated, "If you are a beneficial owner and do not vote via the Internet or telephone or by returning a signed voting instruction card to your broker, your shares may be voted only with respect to so-called routine matters where your broker has discretionary voting authority over your shares. Brokers do not have such discretionary authority to vote on any of the proposals."

194.    The Special Meeting Proxy Statement was further contradictory when stating on page 23, "As to Proposals No. 1 through No.3, however, regarding . . . Approval of Adjournment . . . an abstention will have the same effect as a vote '**AGAINST**' the proposal." As noted on page 20, however, "The affirmative vote of holders of a majority of our common stock voting at the Special Meeting is required to approve the Adjournment. Abstentions and broker non-votes will not be counted as votes cast and, therefore, will have no impact on the approval of this proposal."

195.    On October 26, 2016, the Company announced the voting results from the Special Meeting, with 112,946,840 votes purportedly "for" the Stock Split Amendment, just exceeding the 107,240,970 vote minimum required to approve the amendment. Just like the Increased Share Amendment, broker non-votes were purportedly not counted "for" the Stock Split Amendment, nor "for" Proposal 3 regarding adjournment of the Special Meeting. The voting results, however, noted 96,352,527 broker non-votes "for" Proposal 2. Votes "for" Proposals 1

and 3, however, as later admitted by the Meeting Directors and the Company, included broker non-votes "for" the Proposals, and thus the Company's statements in the Special Meeting Proxy Statement regarding broker discretionary authority were false, or brokers disregarded the statements and improperly exercised discretionary voting authority to vote on Proposals 1 and 3.

196.    After initiation of the Delaware Action, the Meeting Directors and the Company contended that the disclosures in the Special Meeting Proxy Statement were false and that they thus did not count broker non-votes improperly as votes "for" the Stock Split Amendment. The Meeting Directors and the Company also contended that the brokers did have discretionary authority to vote on the Stock Split Amendment and that they voted shares on the Stock Split Amendment in spite of the fact that the Special Meeting Proxy Statement repeatedly and clearly expressed that those brokers lacked such authority. A reasonable stockholder, believing that providing no voting instructions to their broker would have the same effect as providing instructions to vote "against" due to the statements made in the Special Meeting Proxy Statement, may have chosen simply not to provide voting instructions if they opposed the Stock Split Amendment. Thus, the false disclosures by the Company could have had a material outcome on the voting result, as the Stock Split Amendment was purportedly approved by just 5,705,870 shares.

197.    The Meeting Directors chose not to make corrective disclosures or to challenge the broker votes "for" the Stock Split Amendment because the Meeting Directors got the outcome they wanted—the Stock Split Amendment getting approved.

198.    On November 1, 2016, the Stock Split Amendment was signed and on November 2, 2016, it was filed with the Delaware Secretary of State. The Company performed the maximum reverse split of 20 for 1. Notably, the text of the amendment that was filed was

different from the text that was disclosed to stockholders in the Special Meeting Proxy Statement. The Special Meeting Proxy Statement stated, in relevant part:

> If the Reverse Stock Split is approved, Article III, Section A of the Charter is amended and restated in its entirety as follows:
>
> "A. **Classes of Stock.** This Corporation is authorized to issue [●] shares, of which [●] shall be Common Stock with a par value of $0.0001 per share (the "Common Stock") and [5,000,000] shares shall be Preferred Stock with a par value of $0.0001 per share.
>
> <u>Reverse Stock Split</u>. Effective at 12:01 a.m., Eastern [Daylight Savings] Time on [●] [●], 2016 this Certificate of Amendment of the Amended and Restated Certificate of Incorporation with the Secretary of State of the State of Delaware (the "Split Effective Time"), the shares of Common Stock issued and outstanding immediately prior to the Split Effective Time and the shares of Common Stock issued and held in the treasury of the Corporation immediately prior to the Split Effective Time are reclassified into a smaller number of shares such that each two to twenty shares of issued Common Stock immediately prior to the Split Effective Time is reclassified into one share of Common Stock, the exact ratio within the two to twenty range to be determined by the board of directors of the Corporation prior to the Split Effective Time and publicly announced by the Corporation. Notwithstanding the immediately preceding sentence, no fractional shares shall be issued and, in lieu thereof, upon surrender after the Split Effective Time of a certificate which formerly represented shares of Common Stock that were issued and outstanding immediately prior to the Split Effective Time, any person who would otherwise be entitled to a fractional share of Common Stock as a result of the reclassification, following the Split Effective Time, shall be entitled to receive a cash payment equal to the fraction to which such holder would otherwise be entitled multiplied by the closing price of a share of Common Stock on the NASDAQ Capital Market immediately following the Split Effective Time.
>
> Each stock certificate that, immediately prior to the Split Effective Time, represented shares of Common Stock that were issued and outstanding immediately prior to the Split Effective Time shall, from and after the Split Effective Time, automatically and without the necessity of presenting the same for exchange, represent that number of whole shares of Common Stock after the Split Effective Time into which the shares of Common Stock formerly represented by such certificate shall have been reclassified (as well as the right to receive cash in lieu of fractional shares of Common Stock after the Split Effective Time)."

199.   The Special Meeting Proxy Statement also stated that "[t]he Certificate of Amendment attached hereto as Annex A reflects the changes that will be implemented to our

Charter if the Reverse Stock Split is approved." Annex A however left blank the resolution that would be incorporated. The resolution was provided in the Stock Split Amendment that was ultimately filed with the Delaware Secretary of State, stating, in relevant part:

> **RESOLVED**, that the Certificate of Incorporation of this corporation be amended by changing the Article thereof numbered "Section (A) of Article ITI" so that, as amended and restated, said Article shall be and read as follows:
>
> A. Classes of Stock. This Corporation is authorized to issue 355,000,000 shares, of which 350,000,000 shall be Common Stock with a par value of $0.0001 per share (the "Common Stock") and 5,000,000 shares shall be Preferred Stock with a par value of $0.0001 per share.
>
> Reverse Stock Split. Effective at 12:01 a.m., Eastern Standard Time on November 11, 2016 (the "Effective Time"), each 20 shares of common stock issued and outstanding or held by the Corporation in treasury immediately prior to the Effective Time (the "Old Common Stock") shall automatically without further action on the part of the Corporation or any holder of Old Common Stock, be reclassified, combined and changed into one fully paid and nonassessable share of new common stock (the "New Common Stock"). There shall be no fractional shares issued with respect to the New Common Stock. In lieu thereof, the aggregate of all fractional shares otherwise issuable to the holders of record of Old Common Stock shall be issued to Computershare (the "Transfer Agent"), as agent, for the accounts of all holders of record of Old Common Stock otherwise entitled to have a fraction of a share issued to them. The sale of all fractional interests will be effected by the Transfer Agent as soon as practicable after the Effective Time on the basis of prevailing market prices of the New Common Stock at the time of sale. After such sale and upon the surrender of the stockholders' stock certificates, the Transfer Agent will pay to such holders of record their pro rata share of the net proceeds derived from the sale of the fractional interests. From and after the Effective Time, certificates representing the Old Common Stock shall represent the number of whole shares of New Common Stock into which such Old Common Stock shall have been reclassified, combined and changed pursuant to this Certificate of Amendment, subject to the elimination of fractional share interests as described above.

200.    On November 11, 2016, the reverse split became effective and on November 14, 2016, the Company's stock began trading on a split-adjusted basis.

201.    On February 9, 2017, the Company filed a prospectus with the SEC providing for the sale of 17 million shares of common stock for $1.00 per share and warrants to purchase

another 17 million shares for $1.10 per share.  Per the prospectus, as a result of the 20 for 1 reverse split there were 15,190,473 shares of Company stock outstanding at the time the prospectus was filed.  The Meeting Directors thus sold millions of shares causing substantial dilution of stockholder equity immediately after performing a reverse stock split to increase the Company's stock price and reduce the number of shares outstanding.  In fact, prior to the 2016 Annual Meeting, stockholders entitled to vote at the 2016 Annual Meeting (excluding the Individual Defendants and any person, firm, trust, corporation or other entity related to or affiliated with any of them) held 99.7% of the Company's equity.  Following the 2016 Special Meeting and a series of issuances of stock, the same group's equity and voting interests in the Company shrank to less than 25%.  The shares and underlying warrants that were issued, however, were not validly issued because the Stock Split Amendment and the Increased Share Amendment are not valid.  Thus, the Company lacked the authorization under its certificate of incorporation to issue those shares.

202.    On May 30, 2017, the Company filed a preliminary proxy (the "Preliminary Proxy") for a special meeting of stockholders to vote to ratify the filing and effectiveness of five certificate amendments dating back to 2011, under Section 204 of the Delaware General Corporation Law ("Section 204"), concerning four amendments increasing the number of authorized shares and the Stock Split Amendment (the "Section 204 Amendments").

203.    The Preliminary Proxy states that there "may be uncertainty regarding the validity and effectiveness" of each of the Section 204 Amendments.  The Company asked stockholders to ratify the amendments under Section 204 with a vote.

204.    The Preliminary Proxy also noted that the proxy statement for each of the respective meetings to vote on each of the Section 204 Amendments stated that brokers did not

have discretionary authority to vote on the Section 204 Amendments, and that such statements in the proxy statements were incorrect because brokers were entitled to vote under NYSE rules (Galena trades on the NASDAQ) on the Section 204 Amendments.  The Preliminary Proxy also noted that brokers purportedly voted shares without instruction from the beneficial owners of the shares.

205.    The Meeting Directors do not state why the prior proxy statements containing the respective Section 204 Amendment proposals contained the statements saying that brokers were not able to vote without instructions and why they counted the broker votes anyway.

206.    Moreover, the NYSE rule cited by the Company, NYSE Rule 452.11, does not specifically give brokers discretionary authority to vote on certificate amendments.  The rule actually prohibits discretionary votes by brokers that increase the amount of authorized preferred stock, alters the conditions or terms of existing indebtedness or stock, alters voting provisions or the proportionate voting power of a stock or authorizes the implementation or material revision of an equity compensation plan.

207.    The Preliminary Proxy reveals that the business purposes of the Section 204 Amendments are related to at least one of these aforementioned prohibited actions.  For instance, one of the Section 204 Amendments required for shares to be available to issue under a new incentive compensation plan.  Another of the amendments was required to permit "the exercise of the outstanding stock options held by our directors and executive officers."  The Stock Split Amendment was necessary for the Company to convert debt to equity.

208.    The Company notes in the Preliminary Proxy that brokers can only vote in their discretion on routine matters, which excludes director elections.  If the annual election of directors is not routine, an amendment to the certificate of incorporation cannot be routine.  Rule

452.11 is, at best, ambiguous on what brokers could vote in their discretion on, but the Meeting Directors have determined that brokers do have discretionary authority to vote on amendments to the certificate of incorporation, counted those votes in secret, and are now trying to solve issues with a defective stockholder vote.

209.    The Preliminary Proxy notes that brokers will be permitted to vote in their discretion on each of the ratification proposals because the Section 204 vote is a "routine" matter in which brokers are allowed to vote without instruction from the beneficial owners of the stock.

210.    Such a vote, however, would violate the express terms of Section 204 and be ineffective.  The Preliminary Proxy notes 37,435,524 shares outstanding as of May 30, 2017, and states that a quorum for the special meeting equals a majority of outstanding shares on the record date and the required vote for ratification of each of the Section 204 Amendments is a "majority of shares of our Common Stock outstanding as of the Record Date."  Although the record date was not specified in the Preliminary Proxy, resolutions attached by the Board set the record date as June 1, 2017.  The Preliminary Proxy and attached resolutions thus make clear that all shares of Company stock that are currently outstanding will be able to vote on the Section 204 Amendments.

211.    Section 204, however, specifically prohibits all the shares from voting, with Section 204(c) stating, in relevant part:

> Each defective corporate act ratified pursuant to paragraph (b)(1) of this section shall be submitted to stockholders for approval as provided in subsection (d) of this section, unless:
>
> (1) No other provision of this title, and no provision of the certificate of incorporation or bylaws of the corporation, or of any plan or agreement to which the corporation is a party, would have required stockholder approval of such defective corporate act to be ratified, either at the time of such defective corporate act or at the time the board of directors adopts the resolutions ratifying such defective corporate act pursuant to paragraph (b) (1) of this section; and

(2) Such defective corporate act did not result from a failure to comply with § 203 of this title.

212.    Moreover, Section 204(d) states:

Shares of putative stock on the record date for determining stockholders entitled to vote on any matter submitted to stockholders pursuant to subsection (c) of this section (and without giving effect to any ratification that becomes effective after such record date) shall neither be entitled to vote nor counted for quorum purposes in any vote to ratify any defective corporate act.

213.    "Putative stock" is defined in Section 204 as:

shares of any class or series of capital stock of the corporation (including shares issued upon exercise of options, rights, warrants or other securities convertible into shares of capital stock of the corporation, or interests with respect thereto that were created or issued pursuant to a defective corporate act) that:

a. But for any failure of authorization, would constitute valid stock; or

b. Cannot be determined by the board of directors to be valid stock.

214.    Where a stockholder vote is required for a corporate act seeking ratification, only shares of stock that are not subject to challenge can vote.  A distinction between valid and putative stock is noted by Section 204(d) which requires that "notice shall also be given to the holders of record of valid stock and putative stock . . . ."

215.    Each of the Section 204 Amendments required a vote by stockholders, and thus, Section 204 requires a stockholder vote for ratification.  However, the only non-putative shares that can vote on ratification are those issued pursuant to the Company's certificate of incorporation prior to any of the Section 204 Amendments because the Section 204 Amendments provided for increase of authorized shares and a reverse split.  The Preliminary Proxy specifically notes in six instances, including with respect to each Section 204 Amendment, that "past issuances of common stock may not be valid."

216.    Prior to the first of the Section 204 Amendments in 2011, the Company was authorized to issue 50,000,000 shares, and these shares were reduced to 2,500,000 as a result of the 20 to 1 reverse stock split in 2016.  Despite the validity of the Stock Split Amendment being challenged in the Delaware Action, it has been implemented by the Company and must be considered in determining which of the Company's publicly traded shares are "valid" shares and which are "putative" shares, which are not entitled to vote at the Section 204 meeting.  Thus, there would be only 2,500,000 valid shares entitled to vote at the Section 204 meeting.

217.    The Meeting Directors however, proposed to allow all publicly traded shares to vote on ratification of the Section 204 Amendments, allowing over 34 million more shares to vote on whether those shares themselves are actually valid.  This vote was contrary to the express purpose and language of Section 204.

218.    As it is impossible to identify which 2,500,00 of the 37 million plus publicly trades shares are valid shares, Section 204 is not available for the purpose of ratifying the Section 204 Amendments.

219.    Despite the foregoing, the Company held the Special Meeting on the Section 204 Amendments on July 6, 2017, and announced the same day that the Section 204 Amendments were ratified.  Based on the voting results provided, the Company allowed all publicly traded shares to vote on ratification of the Section 204 Amendments.

**Merger**

220.    On August 7, 2017, Galena, SELLAS Life Sciences Group Ltd, a Bermuda exempted company ("SELLAS"), Sellas Intermediate Holdings I, Inc., a Delaware corporation and a wholly-owned subsidiary of Galena ("Holdings I"), Sellas Intermediate Holdings II, Inc., a Delaware corporation and a wholly-owned subsidiary of Holdings I ("Holdings II") and Galena

Bermuda Merger Sub, Ltd., a Bermuda exempted company and a wholly-owned subsidiary of Holdings II ("Merger Sub"), entered into an Agreement and Plan of Merger and Reorganization (the "Merger Agreement"), pursuant to which, among other things, subject to the satisfaction or waiver of the conditions set forth in the Merger Agreement, Merger Sub will merge with and into SELLAS, with SELLAS becoming an indirect wholly-owned subsidiary of Galena and the surviving corporation of the merger (the "Merger").

221.   On December 29, 2017, the Company completed the Merger

222.   Following the completion of the Merger, Galena Biopharma, Inc. changed its corporate name to SELLAS Life Sciences Group, Inc.

**False and Misleading Statements**

*August 11, 2014 Press Release*

223.   On August 11, 2014, the Company issued a press release announcing its second quarter results for the fiscal quarter ended June 30, 2014.  The Company reported net revenue of $4.5 million for the first half of 2014, compared to no net revenue for the six months ended June 30, 2013, and $2.3 million for the three months ended June 30, 2014.  The press release also commented on the Company's commercial products, stating, in relevant part:

> "With the recent acquisition of our second approved product, Zuplenz, Galena now has two commercial products and three clinical assets in development, providing our shareholders a stratified and diversified pipeline as we look to enhance cancer care and treat its often debilitating side-effects," said Mark J. Ahn, Ph.D., President and Chief Executive Officer. "We are excited for the second half of the year as we continue to advance all of our programs. . . . Commercially, we continue to gain traction with Abstral, and we have begun preparations for the launch of Zuplenz in early 2015."

*August 11, 2014 Form 10-Q*

224.   On August 11, 2014, the Company filed a Form 10-Q with the SEC for its second quarter (the "2Q 2014 10-Q"), signed by Defendant and Dunlap.  The 2Q 2014 10-Q reaffirmed

the financial results reported in the August 11, 2014 press release.  The 2Q 2014 10-Q also noted the Company's "strategy to build value for patients and shareholders by," among other things, "[a]chieving revenue goals for Abstral."

225.    Attached to the 2Q 2014 10-Q were certifications pursuant to Rule 13a-14(a) and 15d-14(a) under the Exchange Act and the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendant Dunlap attesting to the accuracy of the 2Q 2014 10-Q.

***August 11, 2014 Earnings Call***

226.    On August 11, 2014, the Company held an earnings call discussing its second quarter 2014 results.   During the call, Defendants Ahn, Schwartz, and Dunlap made the following false and misleading statements:

- [Ahn]

In addition to a strong second quarter in all programs across the Company, we've had two exciting recent announcements. On the commercial side, we saw continued strength towards actual profitability with the implementation of our Galena Patient Services, or GPS program, ensuring access and strengthening our competitiveness with steadily increasing market share to 7% in a market that actually declined last quarter.

- [Schwartz]

Thank you, Mark. Our Abstral business continues to grow and we remain excited about and committed to the brand. As a reminder, Abstral is a transmucosal immediate release fentanyl, or TIRF product, for the treatment of breakthrough cancer pain in opioid-tolerant patients. Our commercial organization continues to focus on a strategy to broaden patient and provider access to the product, while increasing profitability of the product line.

There are four primary factors have resulted in continued product expansion and a stable business foundation upon which to build: first, ensuring availability, reimbursement, and insurance coverage; second, optimizing our Patient Assistance program; third, strengthening our distribution and our wholesale partnerships; and finally, continued development of our prescriber base. In Q2, we saw growth and improvement across a number of key metrics over Q1.

* * *

Our Q2 market share, as measured by Wolters Kluwer, increased to 7% of prescriptions written, despite the fact that the overall branded TIRF market declined in prescription volume over the same period. These improvements are a direct result of our team's focus and our customers' belief in the unique benefits of Abstral.

- [Dunlap]

Thank you, Brian, and good afternoon everyone. Net revenue from Abstral sales for the second quarter of 2014 was $2.3 million, an increase of 7%/rom last quarter and $4.5 million/or the first two quarters of 2014. We've seen continued growth in market share and continued decline in our gross-to-net deductions, which aren't reflected in the net revenue growth this quarter, due to the timing of customer orders and wholesaler and distributor inventory control affecting our ex manufacturer sales.

\* \* \*

As Mark Schwartz also laid out, the Abstral franchise is growing and becoming more profitable.

227.    The Company's August 11, 2014 statements were false and misleading because they failed to disclose that: (1) Galena violated various federal statutes in relation to its sales of Abstral, including by engaging in the Prescribing Scheme; (2) as a result, the Company was exposed to both criminal and civil liability; (3) Galena's sales figures for Abstral were drawn from unsustainable sales and marketing practices; and (4) the Company failed to maintain internal controls.

### August 21, 2014 CEO Change

228.    On August 21, 2014, the Company announced via press release that Ahn had resigned as President, CEO and as a Company director, and that Defendant Schwartz was appointed as his replacement.  Although the Company noted that Ahn resigned "to pursue other long held personal and professional goals," Ahn was actually forced out of the Company due to his involvement in and insider trading scandal which resulted in him being banned from serving as an executive officer of public companies and him having to pay a substantial fine.

### *September 25, 2014 Press Conference*

229.    On September 25, 2014, the Company held a press conference providing updates on Abstral and Zuplenz and developmental products in the Company's pipeline.   During the press conference failed to disclose that: (1) Galena violated various federal statutes in relation to its sales of Abstral, including by engaging in the Prescribing Scheme; (2) as a result, the Company was exposed to both criminal and civil liability; (3) Galena's sales figures for Abstral were drawn from unsustainable sales and marketing practices; and (4) the Company failed to maintain internal controls.   Instead, Defendant Schwartz misleadingly attributed sales of Abstral to "oncology patients" and that Galena "primarily targe[ed] oncology practices." He stated, in relevant part:

> Since our Abstral launch in October of last year, we have met the goals we laid out for the $1.5 million to $3 million of net revenues we predicted in 2013 and the successful launch of our Galena Patient Services program earlier this year. Over the last several weeks, we've done a thorough analysis of our Abstral program and the current state of the transmucosal immediate relief fentanyl, or TIRF, branded market. Our strategy is focused on targeting oncology patients treated by both pain medicine specialists and oncologists, thus remaining true to the overall mission of the Company. We recognize that our approach of primarily targeting oncology practices has resulted in a slow, but a consistent growth pattern that we believe will result in a viable and strategic business in the long term.
>
> * * *
>
> As I indicated, oncology is the prime goal and mission of the Company and our focus moving forward is really predicated on continue to drive and build deep relationships with all elements of the oncology practice and essentially the oncology business.

### *November 3, 2014 Press Release*

230.    On November 3, 2014, the Company issued a press release announcing its financial results for its third quarter ended September 30, 2014.   The press release reported, "[n]et revenue for the third quarter of 2014 was $1.6 million compared to $1.2 million for the third quarter of 2013, an increase of 25%.   Net revenue for the nine months ended September 30,

2014 was $6.1 million.   The third quarter of 2013 was the first quarter that the company generated net revenue."   Moreover, in the press release, Defendant Schwartz stated, "The company continues to make excellent progress on our clinical programs, and we continue to build our commercial franchise."

### *November 3, 2014 Earnings Call*

231.   On November 3, 2014, the Company held an earnings call discussing its third quarter 2014 results.   During the call, Defendants Lento and Schwartz made the following false and misleading statements:

- [Lento]

I will begin to Abstral, our lead commercial asset. Abstral is a transmucosal immediate release fentanyl, or TIRF product, indicated for the treatment of breakthrough pain in opioid tolerant cancer patients. As noted in our press release, and as Ryan will review in greater detail, our Abstral net revenue was $1.6 million in Q3. As discussed last quarter, this increase in revenue was expected, and was a result of fluctuations in inventory at the wholesale and distribution level. This is not uncommon, as we're still in the first year of our product launch. Our daily paid prescriptions or pulled through sales from our customers have continued to improve through the end of Q3, with an even stronger demand in the first month of Q4. Over time, we expect the ex-manufacturer sales to more closely reflect our daily paid prescription volume. As a reminder, Abstral is a supportive care therapy in a segmented and highly competitive market. According to Wolters Kluwer, our market share of the branded TIRF market in September remained steady with 6% of total prescriptions. The size of the overall TIRF market has fluctuated since our launch, and we remain focused on targeting the long-term and sustainable business within the market. We strongly believe in the potential of Abstral because of its unique clinical attributes, which are advantageous for patients.

We have spent the first year of our launch developing strong relationships with the appropriate healthcare providers who are treating the appropriately indicated patients. The foundation of our Abstral strategy was built upon ensuring product access and insurance coverage for all identified patients.

\* \* \*

2015 will be an important year for our commercial team, and I'm confident about our prospects for continued growth and success. We're focused on building a

long-term oncology supportive care business. Knowing that having both Abstral and Zuplenz will be viewed positively by our oncology focused providers.

• [Schwartz]

Thank you, Ryan. As we look back on our first year of commercial activities, we're proud of the structure we have built. While Chris highlighted some of the challenges, we also know how to address and adapt to them, as the market has changed for Abstral, our commercial team has refined our strategy to ensure the long-term viability and profitability of the franchise.

We'll be taking the same expertise into our launch of Abstral. As a result, we plan to increase our Abstral revenues by over 50% next year and are setting our 2015 net revenue guidance to between $15 million and $18 million.

### November 5, 2014 Form 10-Q

232.    On November 5, 2014, the Company filed a Form 10-Q with the SEC for its third quarter 2014 (the "3Q 2014 10-Q"), signed by Defendants Schwartz and Dunlap.  The 3Q 2014 10-Q reaffirmed the financial results reported in the Company's November 3, 2014 press release.

233.    Attached to the 3Q 2014 10-Q were SOX Certifications signed by Defendants Schwartz and Dunlap, attesting to the accuracy of the 3Q 2014 10-Q.

234.    The Company's November 3, 2014 and November 5, 2014 statements were false and misleading because they failed to disclose that: (1) Galena violated various federal statutes in relation to its sales of Abstral, including by engaging in the Prescribing Scheme; (2) as a result, the Company was exposed to both criminal and civil liability; (3) Galena's sales figures for Abstral were drawn from unsustainable sales and marketing practices; and (4) the Company failed to maintain internal controls.

### March 5, 2015 Press Release

235.    On March 5, 2015, the Company issued a press release announcing its financial results for the fiscal fourth quarter and year ended December 31, 2014.  The press release reported "[n]et revenue was $3.2 million in the fourth quarter of 2014 and $9.3 million for the

year ended December 31, 2014, compared to $1.3 million and $2.5 million, respectively, for the

same periods of 2013." The press release commented further on the Company's financial

highlights for the reporting period and provided future guidance, stating, in relevant part:

> Dr. Schwartz continued, ... [,] "[a]dditionally, we anticipate the commercial arm
> of our business to continue to grow revenue, while enhancing our relationships in
> the oncology community as our development pipeline advances. As reported
> today, we recorded our strongest Abstral quarter to date, hitting above the middle
> of our guidance range for the year, and with the addition of our second
> commercial product in Zuplenz, we expect to nearly double our overall
> commercial sales in 2015."

> Dr. Schwartz concluded, "Our commercial and clinical teams have done a
> tremendous job over the past year to advance our multiple programs. As I assess
> our company, I am not only excited about the next 6-12 months, but for the long-
> term prospects of Galena Biopharma."

* * *

> **FINANCIAL HIGHLIGHTS AND GUIDANCE**

> "2014 was a productive year for Galena with significant advances in our pipeline
> and commercial operations. We are pleased to report $9.3 million net revenue for
> Abstral which is consistent with our guidance of $8 to $10 million for 2014. We
> expect net revenue to increase throughout 2015 based on increased Abstral
> demand combined with the launch of our second commercial product, Zuplenz.
> We reiterate confidence in our net revenue guidance of $15-$18 million for 2015
> for our commercial operations," added Ryan Dunlap, CPA, Vice President and
> Chief Financial Officer.

### *March 5, 2015 Form 10-K*

236.    On March 5, 2015, the Company filed a Form 10-K with the SEC (the "2014 10-

K") for its fourth fiscal quarter and year 2014, signed by Defendants Schwartz, Dunlap,

Hillsberg, Ashton, Chin, Einhorn, Galliker, Kriegsman, and Nisi. The 2014 10-K reaffirmed the

results reported in the Company's March 5, 2015 press release.

237.    In the 2014 10-K, under "Risk Factors," the Company stated, in relevant part:

> In addition, our product labeling, advertising and promotion are subject to
> regulatory requirements and continuing regulatory review. The FDA strictly

regulates the promotional claims that may be made about prescription drug products. In particular, a drug product may not be promoted for uses that are not approved by the FDA as reflected in the product's approved labeling, although the FDA does not regulate the prescribing practices of physicians. The FDA and other agencies actively enforce the laws and regulations prohibiting the promotion of off-label uses, and a company

that is found to have improperly promoted off-label uses may be subject to significant liability, including substantial monetary penalties and criminal prosecution.

* * *

If we are not able to achieve and maintain regulatory compliance, we may not be permitted to market our products, which would adversely affect our ability to generate revenue and achieve or maintain profitability.

238.    Under the section titled, "Management's Discussion and Analysis of Financial Condition and Results of Operations," the 2014 10-K commented on the Company's increase in gross revenue, stating, in relevant part:

The increase in gross revenue is attributable to 2014 being the first full fiscal year for the company recognizing revenue compared to 2013 when the company only recognized revenue in the third and fourth quarters with the launch of our first commercial product. The increase in gross revenue is also attributable to an increase in the number of Abstral prescriptions, with the fourth quarter of 2014 being the strongest quarter for our Abstral prescriptions since acquiring the product.

* * *

We expected 2014 net revenue from the sale of Abstral to be within the $8 million -$10 million range and our net revenue of $9.3 million arrived in the upper half of this guidance. We expect net revenue to increase throughout 2015 based on anticipated increases in number of Abstral prescriptions fulfilled, combined with the effect of our programs which are expected to reduce our gross-to-net revenue adjustments. We acquired our second commercial product, Zuplenz, in the third quarter of 2014 and are expected to launch the product in the second quarter of 2015. There was no gross or net revenue from the sale of Zuplenz in 2014. Our current expectations for 2015 net revenue from the sale of our commercial products is approximately $15 million to $18 million, but there is no assurance we will achieve our expectations.

239.    Attached to the 2014 10-K were SOX Certifications signed by Defendants Schwartz and Dunlap, attesting to the accuracy of the 2014 10-K.

***March 5, 2015 Earnings Call***

240.    On March 5, 2015, the Company held an earnings call discussing its financial results for the fourth quarter and full year 2014.  During the call, Defendants Schwartz, Lento, and Dunlap made the following false and misleading statements:

- [Schwartz]

Our focus is on building Galena into a leading oncology Company. We established our commercial franchise as a strategic component for long-term growth, and sets a foundation for our future.

Our commercial franchise gives us two of the most important elements to maximize the value of our development asset: flexibility, and control. While we are in continuous dialogue with potential partners for our development assets, having our own commercial capabilities provides us with significant leverage to secure better economics around future partnering deals. Or, if we choose, we can commercialize and promote our products ourselves or co-promote in the US with a commercial partner. As Chris will elaborate, the relationships that our commercial team is making now with key oncology healthcare providers, distributors, and managed care groups are not only extremely valuable for selling our current products, but also provide the ability to quickly add future products. Finally, we expect the commercial business to maximize revenues, become accretive, and provide money to the Company to help fund our development assets and minimize shareholder dilution.

- [Lento]

Thank you, Gavin. Today I will walk you through the 2014 successes we have had with our flagship product Abstral . . . .

As noted in our press release, and as Ryan will review in greater detail, our actual net revenue was $9.3 million in 2014. We achieved this number with a focused sales effort, and we are excited for continued growth of Abstral in 2015. As a reminder, Abstral is indicated for the treatment of breakthrough cancer pain, and it is a TIRF, or a transmucosal immediate release fentanyl, product. As Mark mentioned, Galena is an oncology Company, and we are steadfastly focused on building Galena's commercial business within the oncology space.

. . . With that background, I would like to walk you through the metrics are use to evaluate our business. We acquired the US marketing rights for Abstral from Orexo and relaunched the product in the fourth quarter of 2013. We relaunched Abstral that had previously sold approximately $1 million over its previous 12-month period, and we were able to grow the brand to $9.3 million in net revenue in 2014. We believe that we can continue to grow Abstral, and our successful commercialization will carry over to the relaunch of Zuplenz in Q2.

\* \* \*

In addition, on slide number 21 you can see the dramatic impact of our patient assistance rule changes and our GPS services have had on increasing the average number of Abstral units dispensed per pay transaction. In December 2013, the average units of Abstral per pay transaction was roughly 42 tablets. Fast forward to December 2014, and the average number increased roughly 60% to 69 tablets per transaction. In addition to GPS and the program rule changes, providers have become more comfortable prescribing Abstral for their breakthrough cancer pain patients.

- [Dunlap]

Thank you, Chris, and good afternoon, everyone. Net revenue from Abstral sales for the fourth quarter of 2014 was $3.2 million, and $9.3 million for the full year 2014. We're happy to say the Q4 was a record quarter for us, reflecting a 100% increase from the $1.6 million net revenue recorded in Q3 and landing us squarely within our 2014 net revenue guidance of $8 million to $10 million. We are certainly pleased with that trend and remain confident in our 2015 net revenue guidance of $15 million to $18 million, with the expectation that our Abstral business will become cash flow positive by the end of 2015 and will continue to be the key revenue driver this year.

241.    The Company's March 5, 2015 statements were false and misleading because they failed to disclose that: (1) Galena violated various federal statutes in relation to its sales of Abstral, including by engaging in the Prescribing Scheme; (2) as a result, the Company was exposed to both criminal and civil liability; (3) Galena's sales figures for Abstral were drawn from unsustainable sales and marketing practices; and (4) the Company failed to maintain internal controls.

***April 30, 2015 Proxy Statement***

242.    On April 30, 2015, the Company filed the 2015 Proxy Statement in advance of their 2015 Annual Meeting of Stockholders.  The 2015 Proxy statement failed to disclose that: (1) Galena violated various federal statutes in relation to its sales of Abstral, including by engaging in the Prescribing Scheme; (2) as a result, the Company was exposed to both criminal and civil liability; (3) Galena's sales figures for Abstral were drawn from unsustainable sales and marketing practices; and (4) the Company failed to maintain internal controls.

### *May 7, 2015 Press Release*

243.    On May 7, 2015, the Company issued a press release announcing its financial results for its first fiscal quarter ended March 30, 2015.  The press release reported "[n]et revenue was $2.8 million in the first quarter of 2015, a 28% increase compared to $2.2 million for the same period a year ago."  In the press release, Defendant Schwartz commented on the Company's Abstral sales and oncology presence, stating, in relevant part:

> Dr. Schwartz concluded, "Dovetailing the clinical successes during the quarter, the financing that we secured in March was an important achievement for Galena as it provides us the flexibility to advance our development programs and to strengthen our commercial efforts. Our immunotherapy platform has multiple clinical trials ongoing and we look forward to key data readouts from these trials over the next year. Meanwhile, on the commercial front, Abstral sales remain on target, our oncology presence continues to grow, and we reiterate our full year guidance of $15-$18 million for 2015. Additionally, we are now preparing to launch Zuplenz in July, adding a second, supportive care commercial product to our oncology-focused sales portfolio. In total, we have established a strong foundation with our development programs supported by our commercial franchise, and we remain committed to the growth of our company."

### *May 7, 2015 Form 10-Q*

244.    On May 7, 2015, the Company filed a Form 10-Q with the SEC (the "1Q 2015 10-Q") for its first quarter 2015, signed by Defendants Schwartz and Dunlap.  The 1Q 2015 10-Q reaffirmed the results reported in the Company's March 7, 2015 press release.

245.    The 1Q 2015 10-Q stated, under "Risk Factors," that:

In addition, our product labeling, advertising and promotion are subject to regulatory requirements and continuing regulatory review. The FDA strictly regulates the promotional claims that may be made about prescription drug products. In particular, a drug product may not be promoted for uses that are not approved by the FDA as reflected in the product's approved labeling, although the FDA does not regulate the prescribing practices of physicians. The FDA and other agencies actively enforce the laws and regulations prohibiting the promotion of off-label uses, and a company that is found to have improperly promoted off-label uses may be subject to significant liability, including substantial monetary penalties and criminal prosecution.

The FDA's regulations, policies or guidance may change and new or additional statutes or government regulations may be enacted that could further restrict or regulate post-approval activities relating to Abstral. We cannot predict the likelihood, nature or extent of adverse government regulation that may arise from future legislation or administrative action. If we are not able to achieve and maintain regulatory compliance, we may not be permitted to market our products, which would adversely affect our ability to generate revenue and achieve or maintain profitability.

246.    Attached to the 1Q 2015 10-Q were SOX Certifications signed by Defendants Schwartz and Dunlap, attesting to the accuracy of the 1Q 2015 10-Q.

### *May 7, 2015 Earnings Call*

247.    On May 7, 2015, the Company held an earnings call discussing its financial results for its first quarter 2015.  During the call, Defendants Schwartz, Lento, and Dunlap made the following false and misleading statements:

- [Schwartz]

In addition to the development team's accomplishments, our commercial team recorded its second-best quarter of net revenue in the best back-to-back month since Abstral's product launch. Most importantly, we continued our increased penetration within the oncology space as we head into the launch of our second commercial oncology supportive care product, Zuplenz.

- [Lento]

Thank you, Gavin, and good afternoon, everyone. As we shared with today's earnings release and as shown on slide number 11, we reported actual net revenue of $2.8 million for the first quarter of 2015, our second-highest quarter of net revenues since our relaunch of Abstral in 2013. In addition, the overall trend line as measured by end-user product demand continues to grow with March

representing one of our best months to date. Equally important, our gross to net deduction also improved this quarter, from 63% in Q4 2014 to 65% in Ql 2015. One month into the second quarter, our performance metrics indicate a very strong month for Abstral in April as measured by customer demand, but please remember that this is not a direct correlation to our net revenue, which is recorded based on ex-factory sales.

We continue to focus on refining Abstral's prescription fulfillment process as depicted on slide number 12. As a reminder, Abstral is an indicator for the treatment of breakthrough cancer pain in opioid tolerant adult cancer patients.

* * *

Our current market share in the branded turf market remains steady at around 5% of total prescriptions on a monthly basis measured by Wolters Kluwer. While our salesforce continues to call on pain specialists who are treating a large number of cancer patients, our long-term strategy is to develop lasting relationships with medical oncologists, radiation oncologists, and palliative care specialists since we believe this represents the most stable market, the best potential for Abstral, and meets the goals as an oncology-focused organization.

- [Dunlap]

Thank you, Chris, and good afternoon, everyone. I'll start with our P&L shown on slide 22. Net revenue from the sale of Abstral for the first quarter of 2015 was $2.8 million which compares to $2.2 million for the same quarter last year. Based on our historical trends thus far as well as very positive things trends we have seen in the last part of Ql and into Q2, we are pleased with the direction of our sales trends and remain confident in our 2015 net revenue guidance of $15 million to $18 million. Also, with the launch of Zuplenz, we expect that piece of our commercial business to begin contributing to our net revenue by the end of the year.

248.    The Company's May 7, 2015 statements were false and misleading because they failed to disclose that: (1) Galena violated various federal statutes in relation to its sales of Abstral, including by engaging in the Prescribing Scheme; (2) as a result, the Company was exposed to both criminal and civil liability; (3) Galena's sales figures for Abstral were drawn from unsustainable sales and marketing practices; and (4) the Company failed to maintain internal controls.

*August 6, 2015 Press Release*

249.    On August 6, 2015, the Company issued a press release announcing its financial results for its second fiscal quarter ended June 30, 2015.  The press release reported "[n]et revenue was $3.4 million in the second quarter of 2015, a 48% increase compared to $2.3 million reported for the same period in 2014.  Net revenue was $6.1 million in the first half of 2015, a 36% increase compared to $4.5 million reported for the same period in 2014."

250.    In the press release, Defendant Schwartz commented on Abstral sales, the Company's "strongest net revenue quarter to date," and the Company's guidance for the year, stating, in relevant part:

> Dr. Schwartz added, "On the commercial side of our business, last week we launched Zuplenz within our existing commercial infrastructure to treat patients suffering from nausea and vomiting as a result of their chemotherapy, radiation and surgical treatments. And, today we reported improved Abstral sales quarter over quarter resulting in our strongest net revenue quarter to date. Based on current projections, we anticipate that we will come in closer to the lower end of our guidance range, at around $15 million for the year."

### *August 6, 2015 Form 10-Q*

251.    On August 6, 2015, the Company filed a Form 10-Q with the SEC (the "2Q 2015 10-Q") for its second quarter 2015, signed by Defendants Schwartz and Dunlap.  The 2Q 2015 10-Q reaffirmed the results reported in the Company's August 6, 2015 press release.

252.    The 2Q 2015 10-Q, under "Risk Factors," stated, in relevant part:

> ***We may be unable to achieve profitability with our commercial operations in a timely manner, and may have to make changes to our commercial strategy to maximize the value of our commercial assets to our shareholders.***
>
> We launched Abstral in the fourth quarter of 2013, and launched Zuplenz on July 29, 2015. As of June 30, 2015, Abstral has not achieved profitability as a product line, and there is no assurance that it will achieve profitability within the period of time outlined by management in setting our commercial strategy. Also, there is no assurance that we will be successful launching Zuplenz, or that Zuplenz will reach profitability as a product line in timely manner, if ever.
>
> Management may determine that a change to our commercial strategy is necessary to address the lack of profitability of the commercial products. Such

potential strategic changes include, but are not limited to, increased investment in our commercial operations, significant expansion or reduction to our sale force, acquisition of additional commercial products, or partial or full divesture of our commercial products and operations. Any such significant change to our commercial strategy could materially affect the amounts of revenue we generate in future periods, the extent and timing of future costs incurred, and could result in changes to our financial results that are materially different than those realized historically.

253.    Attached to the 2Q 2015 10-Q were SOX Certifications signed by Defendants Schwartz and Dunlap, attesting to the accuracy of the 2Q 2015 10-Q.

*August 6, 2015 Earnings Call*

254.    On August 6, 2015, the Company held an earnings call discussing its second quarter 2015 financial results.   During the call, Defendants Schwartz and Lento made the following false and misleading statements:

- [Schwartz]

As we noted in our press release, we recorded net revenue of $6.1 million thus far this year from Abstral sales, and are very proud of our Commercial team for bringing in our highest quarterly net revenue to date of $3.4 million in Q2.

Abstral is part of the transmucosal immediate release fentanyl, or TIRF, market that is very competitive, and has received a great deal of press this year. As Chris will go into in more detail, our metrics for Abstral are trending in the right direction, although our sales growth has fluctuated quarter-over-quarter based on field demand and wholesaler inventory levels.

Because of the ongoing market dynamics, the quarterly variability around our reported sales, and the fact that we've just launched Zuplenz and have yet to recognize revenue to date for that product, it is appropriate for us to guide to a lower end of our range with the expected full-year revenue of around $15 million for both products. We continue to work to make our Commercial business accretive, and we are evaluating our commercial options and strategy to achieve long-term profitability and maximize the value of our commercial assets, with a goal of building shareholder value.

- [Lento]

Thank you, Gavin. And good afternoon, everyone. I'll start my discussion with Abstral. As a reminder, Abstral is indicated for the treatment of breakthrough cancer pain in opioid-tolerant adult cancer patients, and falls under the TIRF

REMS Access program. I am pleased to report Abstral net revenue of $3.4 million for the second quarter of 2015 -- our highest net revenue quarter since launch.

This is a result of our team adding new prescribers and the continued adoption of our Galena patient services, or GPS program. On slide 16, you can see this trajectory. In addition, our gross to net deduction improved to 77% this quarter compared to 65% in Ql 2015.

* * *

As we have mentioned on previous calls, the growth of Abstral will continue to fluctuate quarter-over-quarter. But as you have seen, the underlying metrics are all trending upwards.

* * *

Our account management team has secured product availability with all of our distribution partners, assuring product access for all healthcare providers and their appropriate patients.

* * *

In summary, our Abstral business is growing, and we are enthusiastic about selling Zuplenz where our very early reception of the product has been positive.

255.     The Company's August 6, 2015 statements were false and misleading because they failed to disclose that: (1) Galena violated various federal statutes in relation to its sales of Abstral, including by engaging in the Prescribing Scheme; (2) as a result, the Company was exposed to both criminal and civil liability; (3) Galena's sales figures for Abstral were drawn from unsustainable sales and marketing practices; and (4) the Company failed to maintain internal controls.

### *November 9, 2015 Press Release*

256.     On November 9, 2015, the Company issued a press release announcing its financial results for its fiscal third quarter ended September 30, 2015.  Moreover, the press release announced that the Company would divest its commercial business (i.e., Abstral and Zuplenz), and that the Company anticipated exiting the commercial business by the end of the

first quarter 2016.    Thus, Galena's commercial business activities were classified as "discontinued operations."  The press release stated, in relevant part:

> SAN RAMON, Calif., Nov. 9, 2015 (GLOBE NEWSWIRE) - Galena Biopharma, Inc. (NASDAQ:GALE), a biopharmaceutical company committed to the development and commercialization of targeted oncology therapeutics that address
> major unmet medical needs, today reported its financial results for the quarter ended
> September 30, 2015. The Company also announced it has completed a strategic review of the organization and has elected to focus its efforts and financial resources exclusively on the continued development of its high value oncology pipeline led by NeuVax™ (nelipepimut-S), and divest its commercial business which consists of Abstral® (fentanyl) Sublingual Tablets and Zuplenz® (ondansetron) Oral Soluble Film.
>
> For financial and accounting purposes, Galena has classified its commercial business activities as discontinued operations effective as of the third quarter, and the Company removes all revenue and expense guidance as it relates to its commercial business.  Galena has engaged a financial advisor to provide strategic advice and a process to divest the commercial business, and the Company anticipates exiting the commercial business by the end of the first quarter of next year. Providers and patients will have ongoing access to both drugs until we have transitioned out of the business.
>
> * * *
>
> Dr. Schwartz continued, "When I assumed the position of President and CEO of Galena, I, along with our executive team, began a careful examination of our operations and assets to determine the optimal strategy for Galena that would enable the greatest opportunity for growth, while maximizing shareholder value. As a result of this analysis and review by our Board of Directors, we have concluded that it is in the best interest of our patients, our shareholders, and the long-term success of our company to focus our energy and resources exclusively on our clinical development programs. Since acquiring the products we have significantly grown the sales of Abstral and successfully launched Zuplenz, and I believe that each has strong commercial potential and offers significant benefits to their respective patient populations. However, the foundation of Galena has always been our cancer immunotherapy programs, which are now rapidly advancing towards several key inflection points. Therefore, we believe it is important for Galena to focus on our core expertise and the successful advancement of our late and mid stage clinical pipeline. We appreciate the dedication and hard work of the commercial team as we transition out of the commercial business and are extremely grateful for all of their efforts."

Dr. Schwartz concluded, "For both patients and shareholders of Galena, there is a much greater opportunity to generate value if we dedicate all of our resources to our clinical programs, and we are eager to move the company in this new direction. As part of this renewed focus, we have officially consolidated at our new headquarters in San Ramon, California. We look forward to discussing these advances in more detail during our third quarter earnings webcast this afternoon."

### *November 9, 2015 Form 10-Q*

257.    On November 9, 2015, the Company filed a Form 10-Q with the SEC (the "3Q 2015 10-Q") for its third quarter 2015, signed by Defendants Schwartz and Dunlap.  The 3Q 2015 10-Q reaffirmed the results reported in the Company's November 9, 2015 press release.

258.    The 3Q 2015 10-Q also stated that Galena had "assessed the commercial business net asset group for impairment pursuant to FASB Topic 360, . . . determin[ed] that the carrying value exceeds the fair value of the assets, [and] therefore has recorded a $8.1 million impairment charge as of September 30, 2015."

259.    Attached to the 2Q 2015 10-Q were SOX Certifications signed by Defendants Schwartz and Dunlap, attesting to the accuracy of the 2Q 2015 10-Q.

260.    On the news announced by the Company on November 9, 2015, the price per share of Company stock fell $0.19, or 11%, from its closing price on that date, to close at $1.53 per share on November 10, 2015.

261.     The Company's November 9, 2015 statements were false and misleading because they failed to disclose that: (1) Galena violated various federal statutes in relation to its sales of Abstral, including by engaging in the Prescribing Scheme; (2) as a result, the Company was exposed to both criminal and civil liability; (3) Galena's sales figures for Abstral were drawn from unsustainable sales and marketing practices; and (4) the Company failed to maintain internal controls.

### *November 20, 2015 Press Release*

262.    On November 20, 2015, the Company issued a press release announcing that Galena had that day sold its Abstral product "to a private company in a deal valued at up to $12 million, with $8 million cash upfront and up to $4 million in additional cash upon the achievement of certain sales milestones, effective as of November 19, 2015."

**December 11, 2015 Departure of Dunlap**

263.    On December 11, 2015, the Company announced that Defendant Dunlap would be leaving the Company, effective December 31, 2015, because he "was unable to relocate his family to the new Company headquarters in San Ramon, California . . . ."

264.    On this news, the price per share of Company stock fell $0.07, or 4.5%, from the previous day's closing price to close at $1.49 per share on December 11, 2015.

**December 22, 2015 Subpoena**

265.    On December 22, 2015, the Company filed a Form 8-K with the SEC announcing that it had received a subpoena from the U.S. Attorney's Office for the District of New Jersey requesting "the production of a broad range of documents pertaining to marketing and promotional practices related to [Abstral]."  The Form 8-K specifically stated:

> On December 16, 2015, Galena Biopharma, Inc. ("Galena") received a subpoena from the U.S. Attorney's Office for the District of New Jersey. The subpoena requests the production of a broad range of documents pertaining to marketing and promotional practices related to the product ABSTRAL® (fentanyl) Sublingual Tablets. Galena intends to cooperate with the government's investigation. Galena can make no assurances as to the time or resources that will need to be devoted to this inquiry or its final outcome, or the impact, if any, of this inquiry or any proceedings on Galena's business, financial condition, results of operations and cash flows.

266.    The Company's November 20, 2015 press release, December 11, 2015 press release, and December 22, 2015 Form 8-K all failed to disclose that: (1) Galena violated various federal statutes in relation to its sales of Abstral, including by engaging in the Prescribing

Scheme; (2) as a result, the Company was exposed to both criminal and civil liability; and (3) the Company failed to maintain internal controls.

### March 10, 2016 Form 10-K

267. On March 10, 2016, the Company filed a Form 10-K with the SEC for the fiscal quarter and year ended December 31, 2015 (the "2015 10-K"), signed by Defendants Schwartz, Hillsberg, Ashton, Chin, Einhorn, Galliker, Kriegsman, and Nisi.

268. The 2015 10-K commented on the Company's revenue recognized from the sale of Abstral during the reporting period, stating, in relevant part:

> We sold Abstral product in the United States to wholesale pharmaceutical distributors and retail pharmacies, or collectively, our "customers," subject to rights of return. During the year ended December 31, 2013, we began recognizing Abstral product sales at the time title transfers to our customer, and providing for an estimate of future product returns. Revenue from product sales is recorded net of provisions for estimated returns, prompt pay discounts, wholesaler discounts, rebates, chargebacks, patient assistance program rebates and other deductions as needed.

269. The 2015 10-K additionally commented on the subpoena Galena received from the USAO – NJ, stating, in relevant part:

> A federal investigation of two of the high-prescribing physicians for Abstral has resulted in the criminal prosecution of the two physicians for alleged violations of the federal False Claims Act and other federal statutes. The criminal trial is set for some time in 2016. We have received a trial subpoena for documents in connection with that investigation and we have been in contact with the U.S. Attorney's Office for the Southern District of Alabama, which is handling the criminal trial, and are cooperating in the production of documents. We are a target or subject of that investigation. There also have been federal and state investigations of a company that has a product that competes with Abstral in the same therapeutic class, and we have learned that the FDA and other governmental agencies may be investigating our Abstral promotion practices. On December 16, 2015, we received a subpoena issued by the U.S. Attorney's Office in District of New Jersey requesting the production of a broad range of documents pertaining to our marketing and promotional practices for Abstral. We have been in contact with the U.S. Attorney's Office for the District of New Jersey and are cooperating in the production of the requested documents. We are unable to predict whether we could become subject to legal or administrative actions as a result of these matters, or the impact of such matters. If we are found to be in violation of the

False Claims Act, Anti-Kickback Statute, Patient Protection and Affordable Care Act, or any other applicable state or any federal fraud and abuse laws, we may be subject to penalties, such as civil and criminal penalties, damages, fines, or an administrative action of exclusion from government health care reimbursement programs. We can make no assurances as to the time or resources that will need to be devoted to these matters or their outcome, or the impact, if any, that these matters or any resulting legal or administrative proceedings may have on our business or financial condition.

The federal False Claims Act prohibits persons from knowingly filing, or causing to be filed, a false claim to, or the knowing use of false statements to obtain payment from, the federal government. *Qui tam* suits filed under the False Claims Act can be brought by any individual on behalf of the government and such individuals, commonly known as "relators" or "whistleblowers," may share in any amounts paid by the entity to the government in fines or settlement. The frequency of filing qui tam actions has increased significantly in recent years, causing greater numbers of health care companies to have to defend such *qui tam* actions and pay substantial sums to settle such actions.

270.    Attached to the 2015 10-K were SOX Certifications signed by Defendant Schwartz attesting to the accuracy of the 2015 10-K.

### *March 11, 2016 Form 10-K/A*

271.    On March 11, 2016, the Company filed Amendment No. 1 to the 2015 10-K with the SEC on Form 10-K/A (the "2015 10-K/A #1"), signed by Defendants Schwartz, Hillsberg, Ashton, Chin, Einhorn, Galliker, Kriegsman, and Nisi.

272.    The 2015 10-K/A #1 commented on the Company's required compliance with federal and state laws, and the Company's involvement in investigations concerning violations of such laws, stating, in relevant part:

> *We are subject to U.S. federal and state health care fraud and abuse and false claims laws and regulations, and we recently have been subpoenaed in connection with marketing and promotional practices related to Abstral. Prosecutions under such laws have increased in recent years and we may become subject to such prosecutions or related litigation under these laws. If we have not fully complied with such laws, we could face substantial penalties.*

> Our former commercial operations and development programs are subject to various U.S. federal and state fraud and abuse laws, including, without limitation,

the federal False Claims Act, federal Anti-Kickback Statute, and the federal Sunshine Act.

A federal investigation of two of the high-prescribing physicians for Abstral has resulted in the criminal prosecution of the two physicians for alleged violations of the federal False Claims Act and other federal statutes. The criminal trial is set for some time in 2016. We have received a trial subpoena for documents in connection with that investigation and we have been in contact with the U.S. Attorney's Office for the Southern District of Alabama, which is handling the criminal trial, and are cooperating in the production of documents. We are not a target or subject of that investigation. There also have been federal and state investigations of a company that has a product that competes with Abstral in the same therapeutic class, and we have learned that the FDA and other governmental agencies may be investigating our Abstral promotion practices. On December 16, 2015, we received a subpoena issued by the U.S. Attorney's Office in District of New Jersey requesting the production of a broad range of documents pertaining to our marketing and promotional practices for Abstral. We have been in contact with the U.S. Attorney's Office for the District of New Jersey and are cooperating in the production of the requested documents. We are unable to predict whether we could become subject to legal or administrative actions as a result of these matters, or the impact of such matters. If we are found to be in violation of the False Claims Act, Anti-Kickback Statute, Patient Protection and Affordable Care Act, or any other applicable state or any federal fraud and abuse laws, we may be subject to penalties, such as civil and criminal penalties, damages, fines, or an administrative action of exclusion from government health care reimbursement programs. We can make no assurances as to the time or resources that will need to be devoted to these matters or their outcome, or the impact, if any, that these matters or any resulting legal or administrative proceedings may have on our business or financial condition.

273.    Attached to the 2015 10-K/A #1 were SOX Certifications signed by Defendant Schwartz attesting to the accuracy of the 2015 10-K/A #1.

274.    On this news, the price per share of Company stock fell $0.03, or 3.3%, from the previous day's closing price to close at $0.86 per share on March 11, 2016.

***April 29, 2016 Form 10-K/A***

275.    On April 29, 2016, the Company filed Amendment No. 3 to the 2015 10-K with the SEC on Form 10-K/A (the "2015 10-K/A #3"), signed by Defendant Schwartz.

276.    The 2015 10-K/A #3 disclosed that on December 17, 2015, the day after the Company received the subpoena from the USAO – NJ, the Compensation Committee held a meeting where it recommended to the Board for approval a stock option grant to Defendant Schwartz to purchase 1,250,000 shares of Company common stock at an exercise price of $1.50 per share.   The Compensation Committee's recommendation was approved by the Board on December 18, 2015.   The 2015 10-K/A #3 stated, in relevant part:

**ITEM 11. EXECUTIVE COMPENSATION.**

* * *

**Overview**

As a result of certain revisions to its charter, the Compensation Committee is responsible for reviewing and approving the compensation of our executive officers other than the Chief Executive Officer (CEO) whose compensation is recommended by the Compensation Committee and approved by the Board of Directors. In fulfilling its oversight responsibilities, the Compensation Committee reviewed and discussed with management the Compensation Discussion and Analysis set forth in this Proxy Statement.

* * *

*Equity Incentive Compensation*

* * *

At a meeting on December 17, 2015, our Compensation Committee recommended to the Board of Directors for approval a grant to Dr. Schwartz of a stock option to purchase 1,250,000 shares of our common stock at an exercise price of $1.50 per share, which equaled the closing market price on the date of grant. The options will vest quarterly over four years, unless Dr. Schwartz's employment is terminated by us without "cause," or by Dr. Schwartz for "good reason," in which case they continue to vest over a 12-month severance period. On December 18, 2015, the Board of Directors approved the recommendation of the Compensation Committee.

277.    Attached to the 2015 10-K/A #3 were SOX Certifications signed by Defendant Schwartz attesting to the accuracy of the 2015 10-K/A #3.

***May 10, 2016 Form 10-Q***

278.    On May 10, 2016, the Company filed a Form 10-Q with the SEC for its first fiscal quarter ended March 31, 2016 (the "1Q 2016 10-Q"), signed by Defendant Schwartz.  The 1Q 2016 10-Q provided additional information on the investigations involving the Company, stating, in relevant part:

> ***We are subject to U.S. federal and state health care fraud and abuse and false claims laws and regulations, and we recently have been subpoenaed in connection with marketing and promotional practices related to Abstral. Prosecutions under such laws have increased in recent years and we may become subject to such prosecutions or related litigation under these laws. If we have not fully complied with such laws, we could face substantial penalties.***
>
> Our former commercial operations and development programs are subject to various U.S. federal and state fraud and abuse laws, including, without limitation, the federal False Claims Act, federal Anti-Kickback Statute, and the federal Sunshine Act.
>
> A federal investigation of two of the high-prescribing physicians for Abstral has resulted in the criminal prosecution of the two physicians for alleged violations of the federal False Claims Act and other federal statutes. The criminal trial is set for some time in 2016. We have received a trial subpoena for documents in connection with that investigation and we have been in contact with the U.S. Attorney's Office for the Southern District of Alabama, which is handling the criminal trial, and are cooperating in the production of documents. On April 28, 2016, a second superseding indictment was filed in the criminal case, which added additional information about the defendant physicians and provided information regarding the facts and circumstances involving a rebate agreement between the Company and the defendant physicians' pharmacy as well as their ownership of our stock. To our knowledge, we are a not target or subject of that investigation. There also have been federal and state investigations of a company that has a product that competes with Abstral in the same therapeutic class, and we have learned that the FDA and other governmental agencies may be investigating our Abstral promotion practices. On December 16, 2015, we received a subpoena issued by the U.S. Attorney's Office in District of New Jersey requesting the production of a broad range of documents pertaining to our marketing and promotional practices for Abstral. We have been in contact with the U.S. Attorney's Office for the District of New Jersey and are cooperating in the production of the requested documents. We are unable to predict whether we could become subject to legal or administrative actions as a result of these matters, or the impact of such matters. If we are found to be in violation of the False Claims Act, Anti-Kickback Statute, Patient Protection and Affordable Care Act, or any other applicable state or any federal fraud and abuse laws, we may be subject to penalties, such as civil and criminal penalties, damages, fines, or an

administrative action of exclusion from government health care reimbursement programs. We can make no assurances as to the time or resources that will need to be devoted to these matters or their outcome, or the impact, if any, that these matters or any resulting legal or administrative proceedings may have on our business or financial condition.

279.    The 1Q 2016 10-Q also provided background on the False Claims Act, the Anti-

Kickback Statute, and the Patient Protection and Affordable Care Act stating, in relevant part:

The federal False Claims Act prohibits persons from knowingly filing, or causing to be filed, a false claim to, or the knowing use of false statements to obtain payment from, the federal government. . . .

The federal Anti-Kickback Statute prohibits persons from knowingly and willfully soliciting, offering, receiving, or providing remuneration, directly or indirectly, in exchange for or to induce either the referral of an individual, or the furnishing or arranging for a good or service, for which payment may be made under a federal health care program such as the Medicare and Medicaid programs. Several courts have interpreted the statute's intent requirement to mean that if any one purpose of an arrangement involving remuneration is to induce referrals of federal health care covered business, the statute has been violated. The Anti-Kickback Statute is broad, and despite a series of narrow safe harbors, prohibits many arrangements and practices that are lawful in businesses outside of the health care industry. Penalties for violations of the federal Anti-Kickback Statute include criminal penalties and civil and administrative sanctions such as fines, imprisonment and possible exclusion from Medicare, Medicaid and other federal health care programs. An alleged violation of the Anti- Kickback Statute may be used as a predicate offense to establish liability pursuant to other federal laws and regulations such as the federal False Claims Act. . . .

The federal Patient Protection and Affordable Care Act includes provisions expanding the ability of certain relators to bring actions that would have been dismissed under prior law. When an entity is determined to have violated the federal False Claims Act, it may be required to pay up to three times the actual damages sustained by the government, plus civil penalties for each separate false claim. . . . The federal Patient Protection and Affordable Care Act includes provisions known as the Physician Payments Sunshine Act, which requires manufacturers of drugs, biologics, devices and medical supplies covered under Medicare and Medicaid to record any transfers of value to physicians and teaching hospitals and to report this data beginning in 2013 to the Centers for Medicare and Medicaid Services for subsequent public disclosures. Manufacturers must also disclose investment interests held by physicians and their family members. Failure to submit the required information may result in civil monetary penalties of up to $1 million per year for knowing violations and may result in liability under other federal laws or regulations. Similar reporting

requirements have also been enacted on the state level in the U.S., and an increasing number of countries worldwide either have adopted or are considering similar laws requiring transparency of interactions with health care professionals.

280.    Attached to the 1Q 2016 10-Q were SOX Certifications signed by Defendant Schwartz attesting to the accuracy of the 1Q 2016 10-Q.

281.    The 2015 10-K, 2015 10-K/A #1, 2015 10-K/A #3, and the 1Q 2016 10-Q failed to disclose that: (1) Galena violated various federal statutes in relation to its sales of Abstral, including by engaging in the Prescribing Scheme; (2) as a result, the Company was exposed to both criminal and civil liability; and (3) the Company failed to maintain internal controls.

*May 24, 2016 Preliminary Proxy Statement*

282.    On May 24, 2016, the Galena filed a preliminary proxy statement on Form PRE 14A (the "PRE 14A").   The PRE 14A commented on the compensation decisions of the Company, stating, in relevant part:

> As a result of certain revisions to its charter, the Compensation Committee is responsible for reviewing and approving the compensation of our executive officers other than the Chief Executive Officer (CEO) whose compensation is recommended by the Compensation Committee and approved by the Board of Directors. In fulfilling its oversight responsibilities, the Compensation Committee reviewed and discussed with management the Compensation Discussion and Analysis set forth in this Proxy Statement.

* * *

> **Role of Executive Officers in Compensation Decisions**
>
> We conduct an annual review of executive compensation, generally in the fourth quarter of the year in review, with a presentation by our CEO to the Compensation Committee regarding each element of our executive compensation arrangements. The Compensation Committee's most recent review occurred on December 17, 2015 with respect to our annual cash bonuses and stock option grants for 2015 and increases in base salaries for 2016. At the Compensation Committee's direction our CEO prepares an executive compensation review for each named executive officer and himself.

*June 3, 2016 Proxy Statement*

283.    On June 3, 2016, the Company filed the 2016 Proxy Statement, which failed to disclose that: (1) Galena violated various federal statutes in relation to its sales of Abstral, including by engaging in the Prescribing Scheme; (2) as a result, the Company was exposed to both criminal and civil liability; and (3) the Company failed to maintain internal controls.

### August 9, 2016 Form 10-Q

284.    On August 9, 2016, the Company filed a Form 10-Q with the SEC for its second fiscal quarter ended June 30, 2016 (the "2Q 2016 10-Q"), signed by Defendant Schwartz.

285.    The 2Q 2016 10-Q, under "Risk Factors," commented on the investigations involving the Company, stating, in relevant part:

> **We are, and in the future may be, subject to legal or administrative actions that could adversely affect our financial condition and our business.**
>
> We are aware that the SEC is investigating certain matters relating to the use of certain outside investor-relations professionals by us and other public companies. We have been in contact with the SEC staff through our counsel and are cooperating with the investigation and in discussions with the SEC staff.
>
> A federal investigation of two of the high-prescribing physicians for Abstral has resulted in the criminal prosecution of the two physicians for alleged violations of the federal False Claims Act and other federal statutes. The criminal trial is set for October 2016. We have received a trial subpoena for documents in connection with that investigation and we have been in contact with the U.S. Attorney's Office for the Southern District of Alabama, which is handling the criminal trial, and are cooperating in the production of documents. On April 28, 2016, a second superseding indictment was filed in the criminal case, which added additional information about the defendant physicians and provided information regarding the facts and circumstances involving a rebate agreement between the Company and the defendant physicians' pharmacy as well as their ownership of our stock. Certain former employees have received trial subpoenas to appear at the trial and provide oral testimony. We have agreed to reimburse those former employees' attorney's fees. To our knowledge, we are not a target or subject of that investigation.
>
> There also have been federal and state investigations of a company that has a product that competes with Abstral in the same therapeutic class, and we have learned that the FDA and other governmental agencies are investigating our Abstral promotion practices. On December 16, 2015, we received a subpoena issued by the U.S. Attorney's Office in District of New Jersey requesting the

production of a broad range of documents pertaining to our marketing and promotional practices for Abstral. We have been in contact with the U.S. Attorney's Office for the District of New Jersey and are cooperating in the production of the requested documents. We are unable to predict whether we could become subject to legal or administrative actions as a result of these matters, or the impact of such matters.

If we are found to be in violation of the False Claims Act, Anti-Kickback Statute, Patient Protection and Affordable Care Act, or any other applicable state or any federal fraud and abuse laws, we may be subject to penalties, such as civil and criminal penalties, damages, fines, or an administrative action of exclusion from government health care reimbursement programs. We can make no assurances as to the time or resources that will need to be devoted to these matters or their outcome, or the impact, if any, that these matters or any resulting legal or administrative proceedings may have on our business or financial condition.

286.    Attached to the 2Q 2016 10-Q were SOX Certifications signed by Defendant Schwartz attesting to the accuracy of the 2Q 2016 10-Q.

287.    The 2Q 2016 10-Q failed to disclose that: (1) Galena violated various federal statutes in relation to its sales of Abstral, including by engaging in the Prescribing Scheme; (2) as a result, the Company was exposed to both criminal and civil liability; (3) the Company engaged in the Voting Misconduct with regard to the 2016 Annual Meeting; and (4) the Company failed to maintain internal controls.

288.    On this news, the price per share of Company stock fell $0.03, or 6.5%, from the previous day's closing price to close at $0.43 on August 10, 2016.

***November 9, 2016 Form 10-Q***

289.    On November 9, 2016, the Company filed a Form 10-Q with the SEC for its third fiscal quarter ended September 30, 2016 (the "3Q 2016 10-Q"), signed by Defendant Schwartz.

290.    The 3Q 2016, under "Risk Factors," made the same disclosures cited above in the 2Q 2016 10-Q, and failed to disclose that: (1) Galena violated various federal statutes in relation to its sales of Abstral, including by engaging in the Prescribing Scheme; (2) as a result, the

Company was exposed to both criminal and civil liability; (3) the Company engaged in the Voting Misconduct; and (4) the Company failed to maintain internal controls.

291.   Attached to the 3Q 2016 10-Q were SOX Certifications signed by Defendant Schwartz attesting to the accuracy of the 3Q 2016 10-Q.

### *January 9, 2017 Form 8-K*

292.   On January 9, 2017, the Company filed a Form 8-K with the SEC, providing an updated on the Company's risk disclosures for the fiscal year ended December 31, 2015 and specifically disclosing that the Company was under criminal investigation by the DOJ.   The Form 8-K stated, in relevant part:

> #### *Abstral Investigation*
>
> As previously disclosed, on December 16, 2015, we received a subpoena issued by the U.S. Attorney's Office for the District of New Jersey requesting the production of a broad range of documents pertaining to our marketing and promotional practices for Abstral, the commercial product we sold in the fourth quarter of 2015. We have been in contact with the U.S. Attorney's Office for the District of New Jersey and Department of Justice, and we have come understand that the investigation being undertaken by the U.S. Attorney's Office for the District of New Jersey and Department of Justice is a criminal investigation in addition to a civil investigation that could ultimately involve the Company as well as one or more current and/or former employees. Pursuant to the Company's charter, we are currently reimbursing any former and current employees' attorney's fees with respect to the investigation. We are cooperating with the civil and criminal investigation, and through our outside counsel we have recently begun preliminary discussions with the government aimed at the ultimate resolution of the investigation regarding the Company.
>
> #### *Update of Risk Factor*
>
> In light of the disclosure above regarding the Abstral Investigation, the Company is updating the risk factor that appear under the heading "Risks Relating to Our Former Commercial Operations" in all quarterly and annual reports filed under the Securities Exchange Act of 1934, as amended, subsequent to the Company's Annual Report on Form 10-K for the Annual Period Ended December 31, 2015. The following risk factor shall be incorporated by reference into all of the Company's registration statements under the Securities Act of 1933, as amended. Investors in our common stock should carefully consider this risk factor below as well as all other risk factors disclosed in our most recent Annual Report on Form

10-K, subsequent Quarterly Reports on Form 10-Q and the other information disclosed by us before making an investment decision.

**Risks Relating to Our Former Commercial Operations**

***We are subject to U.S. federal and state health care fraud and abuse and false claims laws and regulations, and we recently have been subpoenaed in connection with marketing and promotional practices related to Abstral. Prosecutions under such laws have increased in recent years and we may become subject to such prosecutions or related litigation under these laws. If we have not fully complied with such laws, we could face substantial penalties.***

293.     The Form 8-K failed to disclose that: (1) Galena violated various federal statutes in relation to its sales of Abstral, including by engaging in the Prescribing Scheme; (2) as a result, the Company was exposed to both criminal and civil liability; (3) the Company engaged in the Voting Misconduct; and (4) the Company failed to maintain internal controls.

<u>**The Truth Emerges**</u>

***January 31, 2017 Press Release***

294.     On January 31, 2017, the Company issued a press release announcing the resignation of Defendant Schwartz as President, CEO and as a Company director.  The press release stated, in relevant part:

SAN RAMON, Calif., Jan. 31, 2017 (GLOBE NEWSWIRE) -- Galena Biopharma, Inc.(NASDAQ:GALE), a biopharmaceutical company committed to the development and commercialization of hematology and oncology therapeutics that address unmet medical needs, today announced that the Board of Directors has entered into a separation agreement with Mark W. Schwartz, Ph.D. under which Dr. Schwartz will resign from the company and its affiliates as the President, Chief Executive Officer, and member of the Board of Directors, effective today. The Board of Directors expects to appoint an Interim Chief Executive Officer in the next couple weeks.

The Board of Directors also announced that it is in the process of engaging an independent advisory firm to evaluate strategic alternatives for the company focused on maximizing stockholder value. Potential strategic alternatives that may be explored or evaluated as part of this review include continuing to advance the clinical programs as a stand-alone entity, a sale of the company, a business combination, merger or reverse merger, and a license or other disposition of corporate assets of the company. There is no set timetable for this process and

there can be no assurance that this process will result in a transaction. While the Company evaluates its strategic alternatives, Galena's investigator-sponsored immunotherapy trials will remain ongoing. The Company is evaluating the appropriate time to commence the GALE-401 trial and anticipates making a definitive determination in the second half of 2017.

"After critical assessment of the current status of the company, we believe that it is the right time to run a strategic evaluation of our opportunities as we look to maximize value for our stockholders," said Sanford J. Hillsberg, Galena's Chairman of the Board of Directors. "We acknowledge Mark's six years of service with Galena and wish him well in his future endeavors."

### *January 31, 2017 Form 8-K*

295.    On January 31, 2017, the Company filed a Form 8-K with the SEC also concerning Defendants Schwartz's resignation, but provided information regarding his separation agreement with the Company. The Form 8-K stated, in relevant part:

(b) Effective January 31, 2017, Dr. Schwartz resigned from his position as President and Chief Executive Officer and as a member of the board of directors of each of Galena Biopharma, Inc., Apthera, Inc. and Mills Pharmaceutical, LLC (collectively, the "Companies"). For purposes of Dr. Schwartz' Employment Agreement, dated as of August 21, 2014, Dr. Schwartz' resignation was without "Good Reason".

(e) In connection with his resignation, on January 31, 2017, the Company executed a Separation Agreement and General Release with Dr. Schwartz and terminated the Dr. Schwartz' Employment Agreement effective as of the resignation date. The Separation Agreement will be filed with the Annual Report on Form 10-K for the year ending December 31, 2016. The Separation Agreement provides, among other things, for the following: (a) Dr. Schwartz shall, within three days of January 31, 2017, receive his final paycheck and any unpaid vacation; (b) Dr. Schwartz shall receive $302,068.86 less required tax withholdings and authorized deductions, which is equal to six (6) months of the Employee's final base salary and six (6) months of the cost for continued health benefits coverage under COBRA . . . .

### *January 31, 2017 TheStreet Article*

296.    On January 31, 2017, *TheStreet.com* published an article titled "Galena Sacks CEO Amid Escalating Criminal Probe Into Fentanyl Drug Marketing," which stated that "[t]he timing of Schwartz' exit is noteworthy given Galena's admission on Jan. 9 of a criminal

investigation of the company by the U.S. Attorney's Office in new jersey and the U.S. Department of Justice."   The article also noted that "Schwartz was instrumental in Galena acquiring Abstral in 2013 and played a significant role in the drug's marketing, according to former employees."  The article stated, in relevant part:

**Galena Sacks CEO Amid Escalating Criminal Probe Into Fentanyl Drug Marketing**

*The timing of Schwartz' exit is noteworthy given Galena's admission on Jan. 9 of a criminal investigation of the company by the federal prosecutors into the marketing of Abstral.*

**Galena Biopharma (GALE)** sacked CEO Mark Schwartz on Tuesday, marking the second time in less than three years that the troubled drug company's board fired its top executive.

The timing of Schwartz' exit is noteworthy given Galena's admission on Jan. 9 of a criminal investigation of the company by the U.S. Attorney's Office in New Jersey and the U.S. Department of Justice. The Feds are investigating Galena's marketing and promotional practices for Abstral, the company's fentanyl-based painkiller, according to an 8-K filing with the Securities and Exchange Commission.

Schwartz was instrumental in Galena acquiring Abstral in 2013 and played a significant role in the drug's marketing, according to former employees. Galena divested Abstral in 2015.

Federal prosecutors in Alabama are prosecuting two doctors who were frequent prescribers of Abstral and Subsys, the fentanyl spray marketed by **Insys Therapeutics (INSY - *Get Report*)** , on mail fraud, kickback and bribery charges. Prosecutors have issued a subpoena to Galena for documents. The criminal indictment against the Alabama doctors was also revised to include information about a rebate agreement between the company and the accused doctors' pharmacy as well as their ownership of Galena stock, according to Galena's 8-K.

***February 1, 2017 San Francisco Business Times Article***

297.    On February 1, 2017, the *San Francisco Business Times* published an article titled, "Biopharma CEO Exits As Pain Drug Marketing Probe Deepens," which similarly associated the resignation of Defendant Schwartz with the then pending criminal proceedings against Drs. Couch and Ruan and criminal investigation of Galena.

298.    The article stated that "Galena Biopharma Inc. CEO Mark Schwartz abruptly left his post Tuesday, the company said, as a U.S. Justice Department investigation continues into the marketing of a powerful painkiller drug and the company ponders its future."  The article further stated that "Federal investigators from the U.S. Attorney's Office in New Jersey and the Department of Justice have been investigating alleged 'pill mills' that prescribe painkillers and have fueled a national painkiller addiction epidemic.  Abstral was among drugs prescribed by John Patrick Couch and Xiulus Ruan, co-owners of Physicians' Pain Specialists of Alabama, who have been charged by federal prosecutors with fraud."

299.    On this news, the price per share of Company stock fell $0.37, or 22.4%, from the previous day's closing price to close at $1.28 on February 1, 2017.  By the close of market on February 2, 2017, the price per share of Company stock had fallen an additional $0.16, or 12.5%, to $1.12.

### *September 8, 2017 DOJ Settlement*

300.    On September 8, 2017, the DOJ announced a settlement agreement with the Company concerning the DOJ and USAO – NJ's investigation regarding the Company's marketing and promotional practices for Abstral.

301.    The settlement agreement involves a non-criminal resolution and a civil payment of approximately $7.6 million, plus interest accrued since the date of reaching an agreement in principle, paid over four equal payments over the course of 12 months, in exchange for a release of government claims in connection with the investigation upon payment of the settlement amount.  The first payment is currently set to be made in the third quarter 2017.

### Defendant Schwartz's Severance Payment

302.    The Individual Defendants who are on the Board breached their fiduciary duties by approving a separation agreement for Defendant Schwartz awarding him over $300,000, and

by failing to properly investigate the issues raised by the USAO – NJ subpoena and Defendant Schwartz's involvement before approving his severance payment.   Moreover, Defendant Schwartz's severance payment was awarded in part because his resignation was termed to be without "Good Reason."  At least a portion of his severance agreement would not have been paid to him had he been terminated "for cause," which he should have been based on his involvement in the schemes as described herein.  Defendants Ashton, Chin, Gray, Nisi, and Galliker, who were members of the Compensation Committee at the time and actually recommended the severance payment, are especially liable for such breach.

### Summary of Individual Defendants' Misconduct

303.   In breach of their fiduciary duties, the Individual Defendants willfully or recklessly caused or permitted the Company to make the false and misleading statements and omissions of material fact to the investing public as set forth above.

304.   Moreover, the Individual Defendants failed to correct and/or caused the Company to fail to correct the false and/or misleading statements and/or omissions of material fact referenced herein, rendering them personally liable to the Company for breaching their fiduciary duties.

305.   Additionally, while the Individual Defendants caused the Company's stock to be artificially inflated, one of the Individual Defendants benefitted himself by engaging in insider sales.

306.   In further breach of their fiduciary duties, the Individual Defendants failed to maintain adequate internal controls.

307.   The Individual Defendants also breached their fiduciary duties by causing the Company to engage in the Prescribing Scheme.

308.     The Meeting Directors also breached their fiduciary duties by causing the Company to engage in the Voting Misconduct.

309.     Additionally, the Individual Defendants that are members of the Board breached their fiduciary duties by approving Defendant Schwartz's severance agreement.

## DAMAGES TO GALENA

310.     As a direct and proximate result of the Individual Defendants' conduct, Galena will lose and expend many millions of dollars.

311.     Such expenditures include, but are not limited to, legal fees associated with the Securities Class Action filed against the Company, two of the Company's former CEOs, its former CFO, and two of its former Senior Vice Presidents, and the Delaware Action filed against current and former members of the Board, and any internal investigations, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

312.     Additionally, these expenditures include, but are not limited to, lavish compensation and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company.

313.     These losses include, but are not limited to, the $7.5 million settlement that the Company had to pay to the government as a result of the DOJ and USAO – NJ's investigation and its engagement in the Prescribing Scheme.

314.     Additionally, these losses include, but are not limited to, the assets wasted by the Company in sending out proxies for, and conducting the meeting concerning, ratification of the Section 204 Amendments—amendments that were initially approved and then ratified using invalid votes.

315.     Such losses include, but are not limited to, the severance payment made and/or to be made to Defendant Schwartz.

316.     As a direct and proximate result of the Individual Defendants' conduct, Galena has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations and the Individual Defendants' breaches of fiduciary duties and unjust enrichment.

## DERIVATIVE ALLEGATIONS

317.     Plaintiff brings this action derivatively and for the benefit of Galena to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of Galena, gross mismanagement, abuse of control, waste of corporate assets, unjust enrichment, violations of Section 14(a) of the Exchange Act, as well as the aiding and abetting thereof.

318.     Galena is named solely as a nominal party in this action.  This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

319.     Plaintiff is, and has been since before the beginning of the Relevant Period, a shareholder of Galena.  Plaintiff will adequately and fairly represent the interests of Galena in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

320.     Plaintiff incorporates by reference and re-alleges each and every allegation stated above as if fully set forth herein.

321.     A pre-suit demand on the Board of Galena is futile and, therefore, excused.  At the time of filing of this action, the Board consists of the following seven individuals: Fabio Lopez ("Lopez"), Angelos M. Stergiou ("Stergiou"), David A. Scheinberg ("Scheinberg"), Stephen F. Ghiglieri ("Ghiglieri"), John Varian ("Varian"), Robert L. Van Nostrand ("Van Nostrand"), and Jane Wasman ("Wasman") (collectively, the "Directors").  Plaintiff needs only to allege demand futility as to four of the seven directors who are on the Board at the time this action is commenced.

322.     Reasons that demand on Lopez is futile follow.  The pre-Merger Board appointed Lopez as a Company director effective as of the effective time of the Merger.  Lopez is the CEO and an indirect owner of Equilibria Capital Management Limited ("Equilibria"), which, together with its affiliates, owns 47% of the Company's common stock as a result of the Merger.  Prior to the Merger, in June 2016, Equilibria and SELLAS entered into a Management & Strategic Collaboration Agreement (the "Collaboration Agreement"), pursuant to which Equilibira would provide strategic, management, and capital raising advice to SELLAS in exchange for certain fees including payment of incurred expenses.  Moreover, SELLAS agreed to pay Equilibria an incentive fee equal to 2% of the gross value paid by a purchase if SELLAS were sold as part of a strategic transaction.  In February 2017, the Collaboration Agreement was modified to include the Merger as a "strategic transaction," and pursuant to the completion of such a transaction Equilibria would receive an incentive fee of 2% of the post-merger fully diluted market value of SELLAS immediately after closing the merger, payable in a combination of cash and common shares of SELLAS.  In connection with the completion of the Merger, Equilibria received a cash payment of $85,000 and 2,720 common shares of SELLAS as compensation from SELLAS.  These common shares of SELLAS were exchanged for 2.74 million shares of Company common

stock, which represented approximately 47% of the Company's common stock.  Thus, Lopez directly benefited from the Merger and he is unlikely to initiate an action against the Individual Defendants, the majority of whom approved of the Merger that he directly benefitted from. Moreover, the Company admits in its Form 8-K/A filed with the SEC on January 11, 2018 that Lopez is not an independent director.

323.    Reasons that demand on Stergiou is futile follow.  Stergiou has served as the CEO and as a director of SELLAS since its founding in 2012, and now serves as the Company's CEO. His principal occupation is with the Company, which relies on for his livelihood.  Thus, he his beholden to Lopez, who is a controlling shareholder of the Company.  The Company admits in its Form 8-K/A filed with the SEC on January 11, 2018 that Stergiou is not an independent director.

324.    Reasons that demand on Scheinberg is futile follow.  Scheinberg has served on SELLAS's Scientific Advisory Board since 2015.  As an employee of the Company, Scheinberg is beholden to Lopez, who is a controlling shareholder of the Company.  The Company admits in its Form 8-K/A filed with the SEC on January 11, 2018 that Scheinberg is not an independent director.

325.    Reasons that demand on Ghiglieri is futile follow.  Ghiglieri served as the Company's interim CEO from February 2017 to December 2017, during which time he also served as the Company's CFO beginning in November 2016.  During the time he served as interim CEO, Ghiglieri was entitled to, and received at least in part, lavish compensation, including a base salary of $450,000, a target bonus of 50% of base salary, and a severance of 12 months base salary if terminated without cause.   Thus, he has not been independent.

326.    The Directors entered into the Merger Agreement in which the Company agreed to indemnify previous officers and directors, including the Individual Defendants, instead of bringing an action against them for the wrongdoing discussed herein.  Thus, demand as to the Directors is futile and excused.

327.    Additional reasons that demand on the Board is futile follow.

328.    The Directors have longstanding business and personal relationships with each other and the Individual Defendants that preclude them from acting independently and in the best interests of the Company and the shareholders.  In fact, the Individual Defendants who served as Board members just prior to the Merger elected the Directors.  Such conflicts of interest preclude the Directors from calling into question the Individual Defendants' conduct. Thus, demand upon the Directors would be futile.

329.    The Directors moreover failed to clawback a severance improperly awarded to Defendant Schwartz by former Board members prior to the Merger, awarding him over $300,000, which was recommended by the Compensation Committee to the Board the day after the Company received the subpoena from the USAO – NJ.  Defendant Schwartz's severance payment was awarded in part because his resignation was termed to be without "Good Reason." At least a portion of his severance agreement would not have been paid to him had he been terminated "for cause," which he should have been based on his involvement in the schemes as described herein.   Thus, demand on the Directors, who have failed to clawback Schwartz's severance, is futile, and excused.

330.    Galena has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Directors have not filed any lawsuits against

themselves or others who were responsible for that wrongful conduct to attempt to recover for

Galena any part of the damages Galena suffered and will continue to suffer thereby.  Thus, any

demand upon the Directors would be futile.

331.    The acts complained of herein constitute violations of fiduciary duties owed by

Galena's officers and directors, and these acts are incapable of ratification.

332.    Thus, for all of the reasons set forth above, all of the Directors, and, if not all of

them, certainly at least four of the Directors, cannot consider a demand with disinterestedness

and independence.  Consequently, a demand upon the Board is excused as futile.

## FIRST CLAIM

### Against Individual Defendants for Violations of
### Section 14(a) of the Securities Exchange Act of 1934

333.    Plaintiff incorporates by reference and re-alleges each and every allegation set

forth above, as though fully set forth herein.

334.    Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall

be unlawful for any person, by use of the mails or by any means or instrumentality of interstate

commerce or of any facility of a national securities exchange or otherwise, in contravention of

such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public

interest or for the protection of investors, to solicit or to permit the use of his name to solicit any

proxy or consent or authorization in respect of any security (other than an exempted security)

registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

335.    Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that

no proxy statement shall contain "any statement which, at the time and in the light of the

circumstances under which it is made, is false or misleading with respect to any material fact, or

which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

336.    Under the direction and watch of the Directors, the 2015 Proxy Statement failed to disclose that: (1) Galena violated various federal statutes in relation to its sales of Abstral, including by engaging in the Prescribing Scheme; (2) as a result, the Company was exposed to both criminal and civil liability; (3) Galena's sales figures for Abstral were drawn from unsustainable sales and marketing practices; and (4) the Company failed to maintain internal controls.

337.    Under the direction and watch of the Directors, the 2016 Proxy Statement failed to disclose that: (1) Galena violated various federal statutes in relation to its sales of Abstral, including by engaging in the Prescribing Scheme; (2) as a result, the Company was exposed to both criminal and civil liability; and (3) the Company failed to maintain internal controls.

338.    Moreover, the 2015 and 2016 Proxy Statements were false and misleading when it discussed the Company's adoption of the Code of Ethics, due to the Individual Defendants' failures to abide by it and their engagement in the Prescribing Scheme and the scheme to issue false and misleading statements and/or omissions of material fact.

339.    In the exercise of reasonable care, the Individual Defendants should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2015 and 2016 Proxy Statements were materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on the matters set forth for shareholder determination in the 2015 and 2016 Proxy Statements, including election of directors, approval of executive compensation, and appointment of an independent auditor.

340.   The Company was damaged as a result of the Individual Defendants' material misrepresentations and omissions in the 2015 and 2016 Proxy Statements.

341.   Plaintiff on behalf of Galena has no adequate remedy at law.

## SECOND CLAIM

### Against the Individual Defendants for Breach of Fiduciary Duties

342.   Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

343.   Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Galena's business and affairs.

344.   Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

345.   The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Galena.

346.   In breach of their fiduciary duties owed to Galena, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and/or misleading statements and/or omissions of material fact that failed to disclose that: (1) Galena violated various federal statutes in relation to its sales of Abstral, including by engaging in the Prescribing Scheme; (2) Galena's sales figures for Abstral were drawn from unsustainable sales and marketing practices and thus not indicative of future performance; (3) as a result of the foregoing, the Company was exposed to both criminal and civil liability; (4) the Company engaged in the Voting Misconduct; and (5) the Company failed to maintain internal controls.

347.    The Individual Defendants also failed to correct and/or caused the Company to fail to correct the false and/or misleading statements and/or omissions of material fact, rendering them personally liable to the Company for breaching their fiduciary duties.

348.    Additionally, while the Individual Defendants caused the Company's stock to be artificially inflated, one of the Individual Defendants benefitted himself by engaging in insider sales.

349.    In further breach of their fiduciary duties, the Individual Defendants failed to maintain adequate internal controls.

350.    The Individual Defendants also breached their fiduciary duties by causing the Company to engage in the Prescribing Scheme.

351.    The Individual Defendants further breached their fiduciary duties by approving Defendant Schwartz's severance agreement, failing to properly investigate the issues raised by the DOJ subpoena and Defendant Schwartz's involvement before approving such agreement, and by failing to terminate his employment "For Cause."

352.    The Meeting Directors also breached their fiduciary duties by causing the Company to engage in the Voting Misconduct.

353.    The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public statements and representations. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them.  Such material misrepresentations and omissions

were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Galena's securities and disguising insider sales.

354.   The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent schemes set forth herein and to fail to maintain internal controls.   The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent schemes set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent schemes and to fail to maintain adequate internal controls, even though such facts were available to them.   Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Galena's securities and engaging in insider sales.

355.   These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

356.   As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Galena has sustained and continues to sustain significant damages.   As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

357.   Plaintiff on behalf of Galena has no adequate remedy at law.

### THIRD CLAIM

**Against Individual Defendants for Unjust Enrichment**

358.   Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

359.   By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Galena.

360.     The Individual Defendants either benefitted financially from the improper conduct and their engaging in lucrative insider transactions tied to the false and misleading statements, or received bonuses, stock options, or similar compensation from Galena that was tied to the performance or artificially inflated valuation of Galena, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

361.     Plaintiff, as a shareholder and a representative of Galena, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, including from insider transactions, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

362.     Plaintiff on behalf of Galena has no adequate remedy at law.

## FOURTH CLAIM

### Against Individual Defendants for Abuse of Control

363.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

364.     The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Galena, for which they are legally responsible.

365.     As a direct and proximate result of the Individual Defendants' abuse of control, Galena has sustained significant damages.  As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations of candor, good faith, and loyalty, Galena has sustained and continues to sustain significant damages.  As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

366.     Plaintiff on behalf of Galena has no adequate remedy at law.

## FIFTH CLAIM

### Against Individual Defendants for Gross Mismanagement

367.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

368.    By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Galena in a manner consistent with the operations of a publicly-held corporation.

369.    As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, Galena has sustained and will continue to sustain significant damages.

370.    As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

371.    Plaintiff on behalf of Galena has no adequate remedy at law.

## SIXTH CLAIM

### Against Individual Defendants for Waste of Corporate Assets

372.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

373.    The Individual Defendants caused the Company to pay themselves excessive salaries, bonuses, fees, and stock grants to the detriment of the shareholders and the Company.

374.    The Individual Defendants also caused the Company to pay an excessive severance payment to its former CEO to the detriment of the shareholders and the Company.

375.    As a result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, Defendants have caused Galena to waste valuable

corporate assets, to incur many millions of dollars of legal liability and/or costs to defend unlawful actions, to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

376.    As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

377.    Plaintiff on behalf of Galena has no adequate remedy at law.

## PRAYER FOR RELIEF

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)    Declaring that Plaintiff may maintain this action on behalf of Galena, and that Plaintiff is an adequate representative of the Company;

(b)    Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Galena;

(c)    Determining and awarding to Galena the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)    Directing Galena and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Galena and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Articles of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and

guidelines of the board;

    2. a provision to permit the shareholders of Galena to nominate at least four candidates for election to the board; and

    3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

    (e)    Awarding Galena restitution from Individual Defendants, and each of them;

    (f)    Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

    (g)    Granting such other and further relief as the Court may deem just and proper.

Dated: January 22, 2018        Respectfully submitted,

**PAWAR LAW GROUP P.C.**

/s/ ___Vik Pawar_____
Vik Pawar, Esq.
6 South Street, Suite 201
Morristown, New Jersey 07960
Telephone: (212) 571-0805
Facsimile: (212) 571-0938
Email: vikrantpawaresq@gmail.com

**THE BROWN LAW FIRM, P.C.**
Timothy W. Brown
240 Townsend Square
Oyster Bay, NY 11771
Telephone: (516) 922-5427
Facsimile: (516) 344-6204
Email: tbrown@thebrownlawfirm.net

*Counsel for Plaintiff*